No. 101,617

STATE OF KANSAS, *Appellant*, v. DERON D. WILLIAMS, *Appellee*.

(300 P.3d 1072)

Opinion filed May 17, 2013.

*Edmond D. Brancant*, deputy district attorney, argued the cause, and *Michael J. Nichols*, assistant district attorney, *Jerome A. Gorman*, district attorney, and *Steve Six*, attorney general, were on the brief for appellant.

*Michael J. Bartee*, of Michael J. Bartee, P.A., of Olathe, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

MORITZ, J.: The State charged Deron Williams with one count of cocaine possession after law enforcement officers arrested him on an outstanding warrant and discovered cocaine in his shoe. The district court granted Williams' motion to suppress the cocaine, concluding officers unlawfully detained Williams before discovering the arrest warrant when they took his identification to run a warrants check and that unlawful detention tainted the evidence found in the search, requiring its suppression. The State appealed and a divided panel of the Court of Appeals reversed the district court's suppression decision. *State v. Williams*, No. 101,617, 2010 WL 348286 (Kan. App. 2010) (unpublished opinion). We granted Williams' petition for review. See 290 Kan. 1104 (2010).

While we agree with the district court that the officers unlawfully detained Williams, we conclude the unlawful detention occurred at an earlier stage in the encounter than did the district court. Specifically, we agree with the Court of Appeals dissent that officers unlawfully detained Williams at the inception of the encounter when they (1) pulled over and parked their patrol vehicle next to Williams as he walked along a sidewalk early in the morning in an isolated area; (2) activated the car's emergency lights; (3) got out of the patrol car and stood on either side of Williams; and (4) immediately began asking Williams questions, all without any reasonable suspicion of his involvement in any criminal activity. We hold under these circumstances, a reasonable person would not have felt free to decline to answer the officers' questions or to otherwise terminate the encounter.

Further, applying the attenuation analysis from *State v. Martin*, 285 Kan. 994, 179 P.3d 457, *cert. denied* 555 U.S. 880 (2008), as

clarified in *State v. Moralez*, 297 Kan. 397, 300 P.3d 1090 (2013), we hold the officers' discovery of an outstanding arrest warrant during Williams' unlawful detention did not purge the taint of that unlawful detention. Accordingly, we reverse the Court of Appeals' decision and affirm the district court's suppression ruling.

FACTUAL AND PROCEDURAL BACKGROUND

The relevant facts are undisputed. Williams' encounter with police began about 2:30 a.m., as patrolling Kansas City, Kansas, police officer Andrew Lewis observed Williams walking westbound on the sidewalk running parallel to Quindaro Boulevard in a vicinity known to law enforcement as a "high crime, high drug" area. Lewis, who was accompanied by a second officer, did not suspect Williams of committing any crimes; nevertheless, he decided to stop Williams for what Lewis characterized as a "pedestrian check."

Lewis testified at the suppression hearing the purpose of a pedestrian check is to ask the pedestrian about what is happening in the area and whether he or she has seen any suspicious activity.

In this instance, Lewis pulled his patrol car next to the sidewalk where Williams was walking and activated his "wigwags,"—two yellow lights on the back of the light bar atop the patrol car—in order to warn traffic he had stopped on the side of the road. As Lewis opened the door of his patrol car, Williams stopped walking and stood near the rear of the patrol car. Both officers got out of the vehicle; Lewis stood near the trunk of the patrol car, and the second officer stood by the passenger door.

Lewis then questioned Williams about where he had been, where he was going, and whether he had seen anything suspicious in the area. After several minutes, Lewis requested Williams' identification to "see if he's got a warrant."

After Lewis ran a computer check and discovered an outstanding warrant, the officers arrested Williams, took him to the county jail, and searched him, discovering cocaine in his shoe.

*District Court's Ruling on Motion to Suppress*

After the State charged Williams with possession of cocaine, he moved to suppress the cocaine, arguing he was unlawfully seized

without reasonable suspicion and the unlawful seizure tainted the evidence found pursuant to his arrest. Williams also argued the discovery of the warrant did not purge the taint of the unlawful seizure. The State agreed that the officers lacked reasonable suspicion of any criminal activity by Williams but argued reasonable suspicion was unnecessary because the encounter commenced as a voluntary encounter and remained voluntary throughout the encounter. Alternatively, the State argued that even if the officers unlawfully detained Williams, the discovery of the outstanding arrest warrant constituted an intervening circumstance that purged the taint of the unlawful detention.

Following an evidentiary hearing, the district court granted Williams' suppression motion. The court found the encounter between Williams and the two officers began as a voluntary encounter but evolved into an unlawful detention when Lewis requested Williams' identification. In so holding, the district court relied on several facts, including the presence of two police officers, the patrol car's flashing emergency lights, Williams' location between the two officers during questioning, and the absence of any reasonable suspicion of Williams' involvement in criminal activity. However, the district court did not consider the State's alternative attenuation argument. The State appealed.

*Court of Appeals' Decision*

A divided Court of Appeals panel reversed the district court's suppression ruling, with the majority characterizing the entire encounter between Williams and the officers as voluntary. Alternatively, the majority applied *Martin* to conclude that even if officers unlawfully detained Williams, the discovery of the outstanding arrest warrant and the nonegregious nature of the officers' actions sufficiently attenuated the discovery of the contraband from the unlawful detention. *Williams*, 2010 WL 348286, at *1-4. In a concurring opinion, Judge Buser more thoroughly considered the totality of the circumstances test before also concluding the entire encounter was voluntary. 2010 WL 348286, at *4-8 (Buser, J., concurring).

In a dissenting opinion, Judge Standridge reasoned the officers unlawfully detained Williams at the beginning of the encounter. Further, applying *Martin*'s attenuation analysis, Judge Standridge would have held that the discovery of the outstanding warrant did not purge the taint of the unlawful detention, requiring suppression of the cocaine. *Williams*, 2010 WL 348286, at *8-13 (Standridge, J., dissenting).

## ANALYSIS

Williams seeks review of two issues: (1) whether the Court of Appeals erred in characterizing Williams' interaction with law enforcement officers as voluntary rather than as an unlawful detention, and (2) whether the Court of Appeals erred in alternatively applying *Martin*'s attenuation analysis to conclude the officers' intervening discovery of an arrest warrant purged the taint of any unlawful detention as to the evidence discovered following Williams' arrest.

*The officers unlawfully detained Williams at the commencement of the encounter without reasonable suspicion of his involvement in any criminal activity.*

Williams claims officers unlawfully detained him at the commencement of the encounter, or, at the very least, when Lewis requested his identification to run a warrants check. The State contends the officers engaged in a voluntary encounter with Williams during which Lewis requested but did not demand Williams' identification.

As discussed below, we need not determine whether Williams was detained without reasonable suspicion when officers requested his identification and ran a warrants check. *Cf. Moralez*, 297 Kan. at 408, (concluding defendant's voluntary encounter with officers evolved into unlawful detention when, without reasonable suspicion of criminal activity, the officers requested and took possession of defendant's identification card and retained it to run a warrants check). Instead, we conclude under the factual circumstances of this case, the officers unlawfully detained Williams at the beginning

of the encounter with no reasonable suspicion whatsoever of his involvement in criminal activity.

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Section 15 of the Kansas Constitution Bill of Rights provides the same guarantee. See *State v. Thompson*, 284 Kan. 763, 772, 779-80, 166 P.3d 1015 (2007).

Voluntary encounters are not considered seizures and do not trigger the protections of the Fourth Amendment. See *State v. Pollman*, 286 Kan. 881, 887, 190 P.3d 234 (2008); *State v. Morris*, 276 Kan. 11, 19, 72 P.3d 570 (2003). It is well established that

" 'law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if he is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.' " *Florida v. Bostick*, 501 U.S. 429, 434, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991) (quoting *Florida v. Royer*, 460 U.S. 491, 497, 103 S. Ct. 1319, 75 L. Ed. 2d 229 [1983]).

And a voluntary encounter is not transformed into a seizure simply because an individual responds to questions or provides identification when approached and questioned by an officer. See *INS v. Delgado*, 466 U.S. 210, 216, 104 S. Ct. 1758, 80 L. Ed. 2d 247 (1984) ("While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response."); *United States v. Laboy*, 979 F.2d 795, 798 (10th Cir. 1992) ("A voluntary encounter involves the voluntary cooperation of a citizen with noncoercive questioning."); see also *State v. Lee*, 283 Kan. 771, 775-78, 156 P.3d 1284 (2007) (concluding voluntary encounter did not evolve into investigatory detention "simply because the officer asked Lee for permission to conduct a pat-down search for weapons" and the defendant "chose to voluntarily comply" with officer's request).

### The Totality of the Circumstances Test

An encounter is no longer voluntary and "a person is seized, thereby triggering a Fourth Amendment analysis of the police action, 'when an officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.' " *Morris*, 276 Kan. at 17 (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 88 S. Ct. 1868, 20 L. Ed. 2d 889 [1968]). When no physical force is involved, a seizure by show of authority occurs when the totality of circumstances surrounding the incident would communicate to a reasonable person the person is not free to disregard the officer's questions, decline the officer's requests, or otherwise terminate the encounter, and the person submits to the show of authority. See *Pollman*, 286 Kan. at 887 (noting a person's interaction with law enforcement is voluntary "if under the totality of the circumstances an officer's conduct conveys to a reasonable person that he or she is free to refuse the officer's requests or otherwise end the encounter"); *Morris*, 276 Kan. at 18-19 (phrasing the question as whether circumstances surrounding the incident "would communicate to reasonable person that he or she is not free to leave").

Some factors to consider in applying the totality of the circumstances test are: "the presence of more than one officer, the display of a weapon, physical contact by the officer, use of a commanding tone of voice, activation of sirens or flashers, a command to halt or approach, and an attempt to control the ability to flee." *State v. McGinnis*, 290 Kan. 547, 553, 233 P.3d 246 (2010). This list of factors is neither exhaustive nor exclusive. Moreover, " 'no one factor is legally determinative, dispositive, or paramount. The outcome does not turn on the presence or absence of a single controlling or infallible touchstone and requires careful scrutiny of all the surrounding circumstances.' [Citation omitted.]" 290 Kan. at 553.

Thus, we first determine whether, under the totality of the circumstances, a reasonable person in Williams' position would have felt free to disregard Lewis' questions, decline his request for identification, or otherwise terminate the encounter.

Although the rationale of the Court of Appeals majority opinion is somewhat unclear, the majority appears to conclude that a rea-

sonable person in Williams' position would have felt free to disregard Lewis' questions and continue walking; thus, the entire encounter between Lewis and Williams was voluntary. *Williams*, 2010 WL 348286, at *1-4 (commenting that "the police in this case did not act with much force" or "exhibit overbearing behavior" and concluding the officers' actions in merely questioning defendant and requesting identification "appear allowable").

However, in a concurring opinion, Judge Buser provided a rationale for the majority's conclusion regarding the voluntariness of the consent. The concurrence suggests that the totality of the circumstances shows that Williams did not submit to a show of authority because Lewis only activated "wigwag" lights to warn other traffic he had stopped his patrol car; Lewis maintained a conversational tone with Williams and did not command him to stop walking; there was no evidence the officers displayed their weapons; the officers did not surround Williams but instead stood 5 to 7 feet away from him; the encounter occurred in public view; the officers did not touch or physically restrain Williams; and Lewis retained Williams' identification only briefly to conduct a warrants check. Judge Buser acknowledged the presence of "a few of the 10 factors typically associated with a police officer's show of authority," including that the officers wore uniforms, Lewis did not inform Williams he was free to go, and Lewis briefly retained Williams' identification. 2010 WL 348286, at *4-5 (Buser, J., concurring).

In contrast, in a dissenting opinion, Judge Standridge concludes the encounter between Williams and the officers began as an involuntary detention. 2010 WL 348286, at *8, 11 (Standridge, J., dissenting). The dissent reasons that regardless of the nature of the questions asked by Lewis during the encounter, the officers' actions "would have conveyed to a reasonable person that he or she was not free to leave." 2010 WL 348286, at *10. In particular, the dissent points out the officers stopped their patrol car on the street immediately in front of Williams, Lewis activated his wigwag lights, and "two fully uniformed police officers exit[ed] the car and position[ed] themselves so that Williams was between the two of them." 2010 WL 348286, at *10. The dissent also finds several additional facts persuasive, including that officers did not request

that Williams answer questions but instead immediately initiated questioning; the officers retained Williams' identification for a period of time; and the officers did not advise Williams he could terminate the encounter. 2010 WL 348286, at *11.

In analyzing whether a reasonable person would have felt free to disregard the officers' questions or to otherwise terminate the encounter under the facts here, the concurring opinion emphasizes the circumstances that *followed* the initial stop while the dissent focuses on the circumstances that *caused* Williams to stop walking. We agree with the dissent that the officers' show of authority and the initial circumstances of the encounter weigh heavily in favor of finding that a reasonable person in Williams' position would have felt compelled to stop and would not have felt free to disregard Lewis' questions, decline his request for identification, or otherwise terminate the encounter.

In this regard, we note the similarities between the facts of this case and the facts before the New Mexico Supreme Court in *State v. Soto*, 143 N.M. 631, 179 P.3d 1239 (2008). There, the court found officers exhibited a show of authority even without activating emergency lights when they pulled their patrol car alongside the defendant as he rode his bicycle on an isolated public street at 2:30 a.m. The *Soto* court further concluded the defendant submitted to the show of authority by stopping his bicycle. 143 N.M. at 632-35.

In *Soto*, officers immediately began questioning the defendant about his activities, asked him for identification, and retained his identification to run a warrant check. Ultimately, the New Mexico court found this conduct, combined with the late hour and the isolated location, would have caused a reasonable person to feel compelled to stop and unable to leave. See 143 N.M. at 632-35; see also *Morris*, 276 Kan. at 21-24 (discussing how activation of emergency lights can be a show of authority and concluding an individual's submission to such a show of authority can support finding of an unlawful detention); *State v. Epperson*, 237 Kan. 707, 708, 713-14, 703 P.2d 761 (1985) (concluding officer unlawfully detained defendant when officer called out to him to wait as he walked away from his car, defendant stopped walking in response,

and officer began asking general questions about defendant's reasons for being in the area).

As in *Soto*, we have no hesitation in concluding that a reasonable person in Williams' circumstances would have felt compelled to stop and unable to leave. Those circumstances include: (1) Williams was walking alone on a sidewalk at 2:30 a.m. on a deserted street; (2) two officers in a patrol vehicle pulled up next to Williams as he walked; (3) the officers activated their emergency lights; (4) the officers both got out of their car and positioned themselves on either side of Williams; and (5) the officers immediately began asking Williams questions without indicating he was free to leave. And, as the State concedes, the officers lacked any reasonable suspicion of Williams' involvement in any criminal activity; thus, the seizure was unlawful.

Accordingly, we reverse the Court of Appeals' conclusion that the stop began as a voluntary encounter and remained a voluntary encounter, and we also reverse the district court to the extent that it found the stop began as a voluntary encounter.

Given the violation of Williams' Fourth Amendment right to be free from an unreasonable seizure, we next consider whether the evidence obtained as a result of the Fourth Amendment violation should have been suppressed through application of the exclusionary rule.

*The officers' discovery of an outstanding arrest warrant did not purge the taint of the unlawful detention.*

When a criminal defendant challenges the State's use of evidence allegedly obtained in violation of the defendant's Fourth Amendment rights, the State bears the burden to establish the lawfulness of the challenged search or seizure. *McGinnis*, 290 Kan. at 551. When the State fails to meet that burden, the evidence may be suppressed through application of the exclusionary rule. See *Herring v. United States*, 555 U.S. 135, 140-48, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009) (explaining limits and purposes of exclusionary rule); *Wong Sun v. United States*, 371 U.S. 471, 487-88, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963) (explaining fruit of poisonous tree doctrine); *State v. Deffenbaugh*, 216 Kan. 593, 598, 533 P.2d 1328

(1975) (describing fruit of poisonous tree doctrine as "one facet of the exclusionary rule" and explaining doctrine is held "to extend the scope of the exclusionary rule to bar not only evidence directly seized, but also evidence indirectly obtained as a result of information learned or leads obtained in the unlawful search").

A primary purpose of the exclusionary rule is deterrence. "[B]ut '[d]espite its broad deterrent purpose, the exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons.' [Citations omitted.]" *Brown v. Illinois*, 422 U.S. 590, 599-600, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975); see *Herring*, 555 U.S. at 144 ("To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it . . . . [T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.").

*The Attenuation Doctrine*

One recognized exception to the exclusionary rule is the doctrine of attenuation. "Under the attenuation doctrine, courts have found that the poisonous taint of an unlawful search or seizure dissipates when the connection between the unlawful police conduct and the challenged evidence becomes attenuated." *State v. Martin*, 285 Kan. 994, 1003, 179 P.3d 457 (2008). When evidence " 'would not have come to light but for the illegal actions of the police,' " the relevant question is whether the allegedly tainted evidence was discovered through " 'exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *Brown*, 422 U.S. at 599 (quoting *Wong Sun*, 371 U.S. at 487-88).

To answer that question we generally consider (1) the time that elapsed between the illegality and the acquisition of the evidence sought to be suppressed, (2) the presence of any intervening circumstances, and (3) the purpose and flagrancy of the official misconduct. *Brown*, 422 U.S. at 603-04; see *Martin*, 285 Kan. at 1003. But no one factor is controlling, and other factors also may be relevant to the attenuation analysis. See, *e.g.*, *Brown*, 422 U.S. at 600-04 (concluding that giving of *Miranda* warnings, standing

alone, cannot support attenuation when confession follows unlawful arrest; but noting that giving of *Miranda* warnings is relevant factor to consider in determining whether confession was sufficiently attenuated from unlawful arrest); *Martin*, 285 Kan. at 1003 (noting no single factor is dispositive).

Whether the taint of a prior illegality has been purged by sufficient attenuation between the unlawful conduct and the discovery of the challenged evidence is a question of fact we review under a substantial competent evidence standard. See, *e.g.*, *State v. Smith*, 286 Kan. 402, 420, 184 P.3d 890, *cert. denied* 555 U.S. 1062 (2008) (whether causal break dissipated taint of unlawful detention is question of fact).

Although the attenuation analysis is fact-driven, and the district court failed to consider the State's attenuation analysis, we may do so for the first time on appeal because the record in this case is sufficiently developed. See *Martin*, 285 Kan. at 1003.

Both parties agree that *Martin* sets out the appropriate framework for applying the attenuation doctrine, but they disagree on whether the discovery of the arrest warrant provided sufficient attenuation between the unlawful detention and the discovery of cocaine in Williams' shoe. In *Martin*, we presumed law enforcement officers unlawfully detained the defendant, and we restricted "our analysis to the question . . . [of] whether the discovery of an outstanding arrest warrant during an unlawful detention is an intervening event which removes the taint of the unlawful detention from evidence retrieved in a search incident to the warrant arrest." 285 Kan. at 998.

After clarifying that the discovery of the arrest warrant did not necessarily control the outcome of the test, this court in *Martin* applied *Brown's* three-factor attenuation analysis to conclude that the first factor weighed against attenuation because of the lack of a temporal break between the unlawful detention and the discovery of the marijuana. However, we held that the second factor weighed in favor of attenuation because the discovery of the arrest warrant represented a "potential break" in the causal chain between the unlawful detention and the discovery of the marijuana. Finally, we concluded the third factor also weighed in favor of attenuation be-

cause the officers' conduct in unlawfully detaining the defendant to obtain his identification and check for warrants was not flagrant. *Martin*, 285 Kan. at 1003-04. Ultimately, we concluded: "[C]onsidering the minimal nature and extent of the official misconduct, the outstanding arrest warrant was an intervening circumstance which sufficiently attenuated the taint of the unlawful detention so as to permit the admission of the fruits of the search incident to arrest." 285 Kan. at 1005.

*Clarification of* State v. Martin *in* State v. Moralez

We recently revisited *Martin* and clarified our holding in that case in *State v. Moralez*, 297 Kan. 397, 300 P.3d 1090 (2013). In *Moralez*, we reaffirmed our conclusion in *Martin* regarding the appropriate framework for analyzing an attenuation issue. But we clarified the significance of the discovery of an outstanding arrest warrant in considering attenuation when that discovery occurs during an unlawful detention.

In *Moralez*, officers detained the defendant by obtaining a copy of his identification card and running a warrants check after he voluntarily engaged in a conversation with officers who were investigating an expired tag on a car in an apartment parking lot. As a result of the suspicionless detention, officers discovered an outstanding warrant for Moralez' arrest and, pursuant to his arrest, discovered marijuana on his person. The district court denied his suppression motion, and the Court of Appeals affirmed.

In reversing the denial of Moralez' suppression motion, we expressly disapproved of any language in *Martin* that could be interpreted to suggest that the discovery of an arrest warrant during an unlawful detention represents an "intervening circumstance" that independently purges the taint of the unlawful detention. Instead, we agreed with the Arizona Supreme Court's conclusion that " 'the subsequent discovery of a warrant is of minimal importance in attenuating the taint from an illegal detention upon evidence discovered during a search incident to an arrest on the warrant.' " *Moralez*, 297 Kan. at 415, (quoting *State v. Hummons*, 227 Ariz. 78, 81, 253 P.3d 275 [2011]).

Further, in *Moralez*, we acknowledged that at least some of our rationale in *Martin* regarding the third factor—the purpose and flagrancy of the police misconduct—conflicted with the rationale of *Brown*, and we expressly disapproved of any language in *Martin* suggesting that "fishing expeditions" by law enforcement officers are generally acceptable as long as the encounter is brief and the officers are courteous. See *Moralez*, 297 Kan. at 416. Finally, we noted that the three factors generally considered in performing an attenuation analysis—temporal proximity, presence of intervening circumstances, and purpose and flagrancy of police misconduct—are neither exclusive nor necessarily entitled to equal weight. Instead, we pointed out that consideration of the relevant factors will necessarily depend on the particular facts presented in each case. See 297 Kan. at 416-17.

Applying this clarified attenuation analysis in *Moralez*, we held that the first factor—the short time between Moralez' initial contact with police and the discovery of the marijuana—weighed heavily in favor of Moralez, while the second factor—the presence of intervening circumstances—was neutral under the circumstances of that case. Regarding the third factor, we concluded the officers' conduct was not egregious because their initial presence in the area was justified by their observance of a vehicle with its lights on and an expired tag, and their conversation with Moralez, at least initially, was voluntary. Nevertheless, we found the officers acted flagrantly by retaining Moralez' identification for the stated purpose of "documenting" who they talked to, but then exceeding that purpose by conducting a warrants check absent any suspicion whatsoever of criminal activity. We held:

"In doing so, [the arresting officer] did more than round out his police report, he conducted an investigatory detention with no suspicion of unlawful activity. Under these circumstances, we conclude the third factor of the *Brown* attenuation analysis weighs slightly in favor of suppression here." 297 Kan. at 418.

Ultimately, we concluded in *Moralez* that the officers' flagrant conduct tipped the balance of the attenuation analysis in favor of Moralez, requiring application of the exclusionary rule. 297 Kan. at 418.

*Application of Attenuation Analysis*

Here, application of the *Martin* attenuation analysis as clarified in *Moralez* weighs even stronger in favor of suppressing the evidence found by officers. Specifically, as in *Moralez*, the first factor weighs heavily in favor of suppression because officers discovered the cocaine only shortly after unlawfully seizing Williams. Further, as in *Moralez*, the second factor essentially is a nullity. Rather than constituting an "intervening circumstance" between the unlawful detention and the discovery of cocaine in Williams' shoe, the discovery of the arrest warrant was a direct consequence of the unlawful detention. And, while the discovery of the outstanding warrant permitted the officers to arrest Williams, it did not permit the State to utilize any evidence seized as a result of the arrest. See 297 Kan. at 414-15, (noting that a "preceding unlawful detention does not taint the lawful arrest on the outstanding warrant, nor does it prevent the officer from conducting a safety search pursuant to that arrest; but it does taint any evidence discovered during the unlawful detention or during a search incident to the lawful arrest").

Finally, the third factor in this case—the purpose and flagrancy of the officers' conduct—weighs heavily in favor of suppression. Importantly, not only did the officers lack reasonable suspicion of Williams' involvement in criminal activity, the record also demonstrates no reason for the officers' encounter with Williams other than to conduct what Officer Lewis described as a "pedestrian check," which, in this case, involved the check for outstanding warrants. *Cf. Moralez*, 297 Kan. at 418, (concluding third factor weighed only slightly in favor of suppression when defendant voluntarily inserted himself into officer's investigation of expired tag on car defendant did not own); *Martin*, 285 Kan. at 1004 (suggesting officers' encounter with defendant was justified, in part, on defendant's misfortune of being in "immediate vicinity of the urinator" whose actions drew officers to area).

In analyzing the third attenuation factor, we find the Illinois appellate court's rationale in *People v. Mitchell*, 355 Ill. App. 3d 1030, 1031-38, 824 N.E.2d 642, *appeal denied* 215 Ill. 2d 611

(2005), instructive. There, two officers approached the defendant as he walked in his neighborhood at 5 a.m. and for no apparent reason asked him questions, requested his identification, and ran a warrants check. After discovering an outstanding traffic warrant, officers arrested and searched the defendant, discovering cocaine.

In affirming the suppression of the cocaine, the *Mitchell* court concluded the third factor—the purpose and flagrancy of the official misconduct—weighed heavily in favor of suppression. Specifically, the court noted "the officers stopped defendant for no apparent reason other than to run a warrant check on him. Thus, the purpose of the stop in this case was directly related to the arrest of defendant, which then led directly to the search of defendant." 355 Ill. App. 3d at 1037-38. Further, the court found the officers exhibited bad faith in detaining the defendant for no reason, and therefore the evidence obtained following the defendant's arrest exploited the original illegality. 355 Ill. App. 3d at 1038. Finally, the *Mitchell* court pointed out that suppression under the facts presented would further the goal of the exclusionary rule, noting "[suppression] appears to be the only way to deter the police from randomly stopping citizens for the purpose of running warrant checks." 355 Ill. App. 3d at 1038.

As we noted in *Moralez*, "[r]egardless of whether a suspicionless detention to identify a citizen and check that citizen for outstanding arrest warrants is characterized as a standard practice, a field interview, a pedestrian check, or a 'fishing expedition,' such a detention can, and often will, demonstrate at least some level of flagrant police conduct." *Moralez*, 297 Kan. at 416.

Such a detention is akin to an investigatory detention, and it is well established and well known to law enforcement officers that an investigatory detention must be supported by reasonable suspicion. See *State v. Thomas*, 291 Kan. 676, 687, 246 P.3d 678 (2011) (noting that brief, investigatory detention is constitutionally and statutorily permitted if " 'an objective officer would have a reasonable and articulable suspicion that the detainee committed, is about to commit, or is committing a crime.' [Citations omitted.]"); K.S.A. 22-2402(1) ("Without making an arrest, a law enforcement officer may stop any person in a public place whom such

officer reasonably suspects is committing, has committed or is about to commit a crime and may demand of the name, address of such suspect and an explanation of such suspect's actions."); see also *State v. Walker*, 292 Kan. 1, 14-16, 251 P.3d 618 (2011) (when law enforcement officer has reasonable suspicion to detain and investigate pedestrian, it is constitutionally permissible for officer to obtain pedestrian's identification and check for outstanding warrants).

As we acknowledged in *Moralez*, the third factor of the *Brown* attenuation analysis underscores the deterrent purpose of the exclusionary rule. Applying the exclusionary rule in cases such as these " 'appears to be the only way to deter the police from randomly stopping citizens for the purpose of running warrant checks.' " *Moralez,* 297 Kan. 415 (quoting *Mitchell,* 355 Ill. App. 3d at 1038).

Because the discovery of cocaine in Williams' shoe directly resulted from the exploitation of Williams' unlawful detention, we reverse the Court of Appeals' reversal of the suppression ruling, and we affirm the district court's suppression ruling as correct for the wrong reason.

The Court of Appeals' decision is reversed, and the district court's suppression ruling is affirmed, but we reverse in part the district court to the extent it found that the stop began as a voluntary encounter.