NOT DESIGNATED FOR PUBLICATION

No. 116,009

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

SEAN M. DIONNE,
*Appellee*.

MEMORANDUM OPINION

Appeal from Reno District Court; TRISH ROSE, judge. Opinion filed May 5, 2017. Affirmed.

*Keith E. Schroeder*, district attorney, and *Derek Schmidt*, attorney general, for appellant.

*Shannon S. Crane*, of Hutchinson, for appellee.

Before ATCHESON, P.J., STANDRIDGE and SCHROEDER, JJ.

*Per Curiam*: The State of Kansas filed this interlocutory appeal from the district court's order suppressing drug evidence seized by the Hutchinson Police Department from Sean M. Dionne, as well as statements Dionne made to law enforcement after he was stopped while walking down the street. This search and seizure resulted in Dionne being charged with four felony drug crimes. For the reasons discussed below, we agree with the district court that law enforcement had no lawful reason to stop Dionne in the first instance and, therefore, any evidence discovered as a result of this unlawful search and seizure must be suppressed. Accordingly, we affirm.

1

FACTS

After receiving a report of a possibly impaired pedestrian in the vicinity of Hutchinson Community College (HCC), Dionne was detained, arrested, and searched incident to that arrest by law enforcement. Dionne filed a motion to suppress the evidence obtained as a result of the search, claiming he was unlawfully detained in the first instance. The court held an evidentiary hearing. The following is a summary of the evidence introduced at the hearing.

*Testimony of HCC campus security officer Michael Smith*

The State's first witness was HCC campus security officer Michael Smith. As part of his job, Smith was patrolling the HCC campus on July 3, 2015. At approximately 2 a.m., Smith observed a male, later identified as Dionne, leaning against a pole outside the campus library. Smith approached Dionne and asked what he was doing. Dionne responded he was waiting on a friend and eventually intended to make his way to the Kwik Shop. Smith thought that Dionne was slurring his words and that Dionne appeared to be under the influence of some substance. Smith instructed Dionne to leave the HCC premises. Dionne complied. Smith testified that as he watched Dionne walk away, Dionne appeared to be swaying or stumbling. After Dionne left, Smith called the Hutchinson Police Department to report his interaction with an individual loitering on campus and to propose the police conduct a welfare check on the individual. Smith described the individual as a white male wearing dark clothing who was traveling on foot.

*Testimony of City of Hutchinson Police Officer James Sanders*

During direct examination, Officer James Sanders testified he was dispatched to the area around HCC to look for an intoxicated white male pedestrian wearing dark clothing. Sanders testified that he came upon Dionne in a residential area near HCC at

16th Terrace and Ford Street and that Dionne—who was wearing dark clothing—was walking in the middle of the street and appeared to be weaving and stumbling. Sanders said he and Sergeant Kristian Sims, who had arrived separately, approached Dionne together. Sanders said he smelled a strong odor of alcohol as he got closer to Dionne and noticed Dionne's eyes were bloodshot. Sanders said he also smelled a strong odor of marijuana. Sanders believed Dionne was intoxicated. When asked by the officers where he was going, Sanders said Dionne responded that he was headed to get something to eat at Dillon's. When asked whether he had been drinking, Sanders said Dionne responded that he had consumed four drinks. Sanders testified it was at this point that Dionne was arrested for public intoxication and was searched incident to that arrest.

On cross-examination, Officer Sanders conceded that some facts to which he testified on direct examination were not accurate. First and foremost, Sanders admitted that, contrary to his testimony on direct examination, he did not see Dionne walking in the middle of the street; instead, Sanders confirmed that Sergeant Sims was already on the scene and in the process of speaking with Dionne in the middle of the street when Sanders arrived. Sanders also agreed that the street where Sergeant Sims and Dionne were standing was not busy with traffic at 2 a.m.

At this time, defense counsel asked for and received permission to introduce into evidence the dash camera video footage from the camera in Sergeant Sims' patrol car and questioned Officer Sanders about certain portions of the video. The video began with Sergeant Sims driving up behind Dionne and shining a spotlight on him. Dionne was walking on the side of the street, facing oncoming traffic. Dionne left the side of the street to walk around a parked car but then returned to the side of the street after passing the car. There was no evidence on the video that Dionne was swaying or stumbling as he walked. At this point, Sergeant Sims stopped his car and called out "sir" to Dionne. Dionne responded by turning around to see Sims getting out of the car to approach him. It was only then that Dionne walked away from the side of the street toward Sims, who was

3

standing in the middle of the street. Dionne put his hand out to shake Sims' hand. Sims asked Dionne his name, how old he was, where he had been, and where he was going. Dionne provided his first and last name, that he was 21 years old, and that he had just left 11th and Maple to walk to Walmart to get food because it was the only place that was open. While he was talking, Dionne started to place his hands behind his back, and Sims asked Dionne to hold his hands where Sims could see them.

It was then that the video showed Officer Sanders arriving at the scene. Sanders walked up to Sergeant Sims and Dionne in the middle of the street. Sims asked Dionne if he had been drinking; Dionne responded "a little bit." Sims told Dionne that he was worried about Dionne walking in the street at that hour because Dionne had been drinking, the bars were closing, and he might get hit by a car. Sims then asked Dionne to come over to the front of his patrol car to "run [him] through a quick test." Sims advised Dionne to stay with Sanders while he retrieved the equipment necessary for the test.

When Sergeant Sims came back, Sims explained that he wanted to see how intoxicated Dionne was so he could determine whether it was safe for Dionne to walk to Walmart. Sims stated, "We'll make sure you're good to go, and if that's the case, then we'll get you out of here and we'll get you to Walmart." Dionne then submitted to a preliminary breath test. Sims advised Dionne that the results of the test reflected Dionne's blood-alcohol content to be .179, more than twice the legal limit to drive. Sims advised Dionne he was not permitted to walk around in public with that level of intoxication because he was "a danger to [himself]" and his "decision-making [was] not great." Sims then said he also was concerned that Dionne smelled like burnt marijuana. Officer Sanders said he also detected the smell of marijuana but wondered whether the smell was coming from gloves that Sanders had used when handling marijuana the previous day. Sims then asked Dionne where the "weed" was; Dionne admitted that he had smoked it but denied that there was any on his person. Sims then had Dionne place his hands on his head and conducted a pat-down search of Dionne, during which Sims ultimately

4

discovered a bag of marijuana, some pill bottles, and various items of drug paraphernalia. After this discovery, Sims handcuffed Dionne and placed him under arrest. Sanders subsequently advised Dionne of his *Miranda* rights.

After viewing the video of the officers' interaction with Dionne, Officer Sanders acknowledged that there were no sidewalks on the street where Dionne was walking, that Dionne was correctly walking towards oncoming traffic, that Dionne was not trespassing on anyone's property, and that Dionne was not walking in the middle of the street. Although Sanders admitted the video did not depict Dionne to be stumbling or weaving, Sanders emphasized that at the time of the incident, he had a good-faith belief that Dionne appeared to be swaying. Finally, Sanders agreed that, contrary to his earlier testimony, Dionne had not said he had four drinks but instead said he had "a little bit" to drink.

Following the testimony and showing of the video as outlined above, the State argued that Dionne's motion to suppress should be denied because law enforcement lawfully stopped Dionne either to conduct a welfare check or to investigate the crime of public intoxication. Conversely, defense counsel argued that the detention did not meet the criteria of a public safety stop and law enforcement lacked reasonable suspicion to believe Dionne was committing a crime.

The district court ruled from the bench, granting Dionne's motion to suppress. Specifically, the judge stated,

> "I have seen enough of the video to make a ruling and I don't find this was a valid stop. The balance here which I will acknowledge right off the bat is a difficult one. Officer Sanders, since you're here specifically I want to say it's not an easy job and we all appreciate the difficulty. But the balance we have to strike is between what we expect of law enforcement, which is a lot. We expect them to protect all of us and balancing that expectation with the rights of individuals. And the truth is that the economy of our area

5

and these areas is such that many people walk or ride a bicycle, don't have—they don't have luxury of having a vehicle. And granted this was at an odd time to be out walking; odd being the middle of the night. I don't think the fact that someone is simply walking should subject them to scrutiny and the truth is Mr. Dionne didn't do anything suspicious. If he had been looking in building windows at HCC or acting furtive on campus, I would certainly consider those facts, but he did not. He's, he left at Security Officer Smith's direction. He walked. What I saw him walking he was on the side of the road that would be the smart side to walk on if there's no sidewalk. He actually veered around the vehicle and then went back toward the curb. I think that's where I would have walked if I had to walk on that street and there wasn't any traffic at the time. These are tough decisions. Again, I acknowledge the defendant balancing if Mr. Dionne had been further toward the middle of the road, I would certainly consider that fact. There are lots of facts. As Counsel know all these cases hinge on seemingly insignificant details as we know. But in this case I believe this is not a proper stop of Mr. Dionne, who was simply walking in an area of town where he legitimately could have been walking. So thank you all."

The State filed a timely notice of interlocutory appeal challenging the district court's decision to suppress the evidence.

ANALYSIS

In reviewing a district court's decision on a motion to suppress, the appellate court determines if the district court had substantial competent evidence upon which to base its decision, but the ultimate legal conclusion of whether to suppress is reviewed de novo. In so doing, this court does not reweigh evidence or assess credibility of witnesses. *State v. Patterson*, 304 Kan. 272, 274, 371 P.3d 893 (2016). We apply this same standard to the State's appeal of a district court's grant of a motion to suppress. See *State v. Talkington*, 301 Kan. 453, 461, 345 P.3d 258 (2015).

The right of the people to be secure in their person against unreasonable searches and seizures is enshrined in the Fourth Amendment to the United States Constitution and

6

in § 15 of the Kansas Constitution Bill of Rights. Evidence obtained by an illegal search or seizure in violation of this right may not be admitted into evidence. *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961). The State bears the burden to prove that a search and seizure was lawful. *State v. Overman*, 301 Kan. 704, 710, 348 P.3d 516 (2015).

In granting Dionne's motion to suppress, the district court held that law enforcement had no valid reason to stop Dionne. Encounters between law enforcement officers and the public are generally classified under one of the following four categories: "consensual encounters, which are not considered seizures; investigatory detentions, commonly known as *Terry* stops (after *Terry v. Ohio*, 392 U.S. 1, 18, 88 S. Ct. 1868, 20 L. Ed. 2d 889 [1968], whose parameters are codified in K.S.A. 22-2402); public safety stops; and arrests." *State v. Johnson*, 293 Kan. 959, 965, 270 P.3d 1135 (2012). The State argues that law enforcement's stop of Dionne could be justified as either a voluntary encounter, a public safety stop, or an investigatory detention.

*Voluntary encounter*

The State first suggests that law enforcement's initial contact with Dionne was voluntary and, therefore, did not constitute a seizure or trigger the protections of the Fourth Amendment. See *State v. Williams*, 297 Kan. 370, 376, 300 P.3d 1072 (2013) (A voluntary encounter is not transformed into a seizure simply because an individual responds to questions or provides identification when approached and questioned by an officer.).

An encounter between law enforcement and an individual will be deemed consensual if, under the totality of the circumstances, a reasonable person would feel free to refuse the officer's requests or otherwise terminate the encounter and go about his or her business. *State v. Reiss*, 299 Kan. 291, 297-99, 326 P.3d 367 (2014). But if the

officer, by means of physical force or show of authority, in some way restrained the citizen's liberty, *i.e.*, the officer's words and/or actions would have conveyed to a reasonable person that he or she was not free to leave, a seizure has occurred. See *Reiss*, 299 Kan. at 298; *Williams*, 297 Kan. at 376.

Notably, the State did not make this argument below; it only suggested to the district court that law enforcement's stop of Dionne was warranted as either an investigatory detention or a public safety stop. Generally, issues not raised before the district court cannot be raised on appeal. See *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014). While there are several exceptions to this general rule, the State does not acknowledge its failure to raise this issue below, let alone suggest that any of these exceptions should apply to warrant our review of the issue. See *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014) (setting forth exceptions to general rule that new legal theory may not be asserted for first time on appeal). Therefore, the State is bound by what it argued below, and we need not entertain the State's voluntary encounter argument on appeal. See Supreme Court Rule 6.02(a)(5) (2017 Kan. S. Ct. R. 34) (requiring appellant to explain why issue that was not raised below should be considered for first time on appeal); *State v. Williams*, 298 Kan. 1075, 1085, 319 P.3d 528 (2014) (failure to comply with Supreme Court Rule 6.02[a][5] risks ruling that the issue is improperly briefed and will be deemed waived or abandoned).

In any event, an objective review of the dash camera video indicates that the encounter between law enforcement and Dionne can hardly be characterized as voluntary because the totality of the circumstances demonstrate that a reasonable person in Dionne's position would not have felt free to leave or otherwise terminate the encounter. When he arrived on the scene, Sergeant Sims, who was dressed in his police uniform, shined a spotlight on Dionne and exited his car. Sims then asked Dionne numerous questions and commanded Dionne to place his hands where Sims could see them. At that time, Officer Sanders, who also was wearing his police uniform, arrived at the scene.

8

Sims then told Dionne that he would need to take a test to determine if it was safe for him to continue on his way. Sims directed Dionne to stand by the front of Sims' car with Sanders. Under these circumstances, Dionne was not free to terminate the encounter or refuse Sims' commands. See *State v. Walker*, 292 Kan. 1, 6, 251 P.3d 618 (2011) (factors to consider whether encounter was voluntary include if there was more than one officer present and officers used sirens or lights, commanding voice tone, and attempted to control defendant's ability to flee).

*Public safety stop*

Next, the State claims the initial stop of Dionne can be upheld as a lawful public safety stop. In support of this claim, the State points to the testimony of Officer Sanders, who said he was dispatched to the area surrounding the HCC campus to check on the welfare of an individual who may be intoxicated.

In Kansas, police officers can perform public safety stops only if the stops are based on specific and articulable facts that a citizen is in need of help or is in peril. *State v. Gonzales*, 36 Kan. App. 2d 446, 450-51, 455-56, 141 P.3d 501 (2006). This community caretaking function by officers is not for investigative purposes and must be motivated by public safety concerns. *State v. Marx*, 289 Kan. 657, 663, 215 P.3d 601 (2009); *Gonzales*, 36 Kan. App. 2d at 457. Although characterized as a "welfare check" on numerous occasions by the witnesses during the suppression hearing, there is simply no evidence in the record to support a finding that Sergeant Sims had reasonable grounds based on articulable facts at the time he detained Dionne to believe Dionne currently was in danger or otherwise was in need of help. Instead, the evidence shows Dionne was lawfully and appropriately walking on a street with no sidewalks without any obvious impairment, disability, or distress.

*Investigatory detention*

Finally, the State claims the initial stop of Dionne can be upheld as a lawful investigatory detention. A law enforcement officer may stop any person in a public place based upon specific and articulable facts raising a reasonable suspicion that such person is committing, has committed, or is about to commit a crime. K.S.A. 22-2402(1); see *State v. Anderson*, 281 Kan. 896, 901, 136 P.3d 406 (2006). Kansas courts have defined reasonable suspicion as a particularized and objective basis for suspecting the person stopped is involved in criminal activity. Reasonable suspicion involves more than an unparticularized suspicion or hunch but less certainty than that of probable cause. Reasonable suspicion depends on the content of the information possessed by the detaining authority and the information's degree of reliability. Both quality and quantity of information are considered in the totality of the circumstances. *State v. Toothman*, 267 Kan. 412, Syl. ¶ 5, 985 P.2d 701 (1999).

In support of a lawful investigatory detention, the State argues that at the time Sergeant Sims detained Dionne, Sims had a particularized and reasonable basis to suspect Dionne was committing the crime of public intoxication as defined in the Hutchinson City Code. Specifically, the State refers us to Hutchinson City Code § 18-402, which provides that it is "unlawful for any person to be under the influence of alcohol or drugs on any public street or highway or in any public place or building within the City to the extent that he [or she] poses a danger to himself [or herself] or others." But we are not persuaded by the State's argument. Apart from a call to police reporting the possibility of an intoxicated pedestrian in the vicinity, Sergeant Sims had no specific or articulable facts at the time he detained Dionne to support a particularized suspicion that Dionne was intoxicated to the extent that he posed a danger to himself or others. Nothing in Dionne′s demeanor as he walked down the street indicated he was under the influence of any intoxicant. Although Sims could have continued to watch Dionne to see if he later exhibited some sign of impairment, Sims had no evidence to suggest Dionne was

10

impaired when Sims stopped him. The district court made this finding as well, which is supported by substantial competent evidence—the dash camera video. And even though the evidence discovered after the initial stop cannot be used to justify the stop itself, we note that such evidence likely would not have been enough to establish reasonable suspicion that Dionne was violating Hutchinson City Code § 18-402. The results of Dionne's preliminary blood test reflect a high blood-alcohol level, meaning he likely would have been guilty of a DUI had he been driving. But Dionne was not driving. And a high blood-alcohol level does not directly correspond to a pedestrian's danger to himself or others.

For the reasons stated above, we agree with the district court that law enforcement had no valid reason to stop Dionne and therefore any evidence obtained as a result of the stop must be suppressed.

Affirmed.

11