IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 115,044

STATE OF KANSAS,
*Appellee*,

v.

FRAN AMILCAR ANDRADE-REYES,
*Appellant*.

SYLLABUS BY THE COURT

1.

Courts generally classify contacts between police and individuals into four categories. Some categories describe a seizure and others do not. The four categories are: consensual encounters, also called voluntary encounters; investigative detentions, commonly known as *Terry* stops; public safety stops; and arrests.

2.

Generally, courts do not consider a consensual encounter to be a seizure within the meaning of the Fourth Amendment. Consent itself makes the encounter reasonable, and the State need not establish that officers had probable cause or reasonable suspicion before initiating the encounter.

3.

Under *Terry v. Ohio*, 392 U.S. 1, 18, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), a stop and frisk may occur if two conditions are met. First, the investigatory stop (temporary detention) must be lawful, a requirement met in an on-the-street encounter when a police officer reasonably suspects that the person apprehended is committing, has committed, or is about to commit a crime. Second, to proceed from a stop to a frisk (pat

1

down for weapons), the officer must reasonably suspect that the person stopped is armed and dangerous.

4.

For an encounter to be voluntary, courts examine whether the officer's conduct would convey to a reasonable person that he or she was free to terminate the encounter.

5.

Appellate courts reviewing a district court's determination of whether an encounter was voluntary examine the factual underpinnings of the district court's findings for substantial competent evidence and conduct a de novo review of the district court's legal conclusions.

6.

The determination of whether an encounter between law enforcement officers and an individual is voluntary is subject to a totality-of-the-circumstances analysis. Several nonexclusive factors weigh on this determination, including: knowledge of the right to refuse; a clear communication that the person is free to terminate the encounter or refuse to answer questions; a physical disengagement before additional questioning; the threatening presence of several officers; the display of a weapon by an officer; some physical touching of the person; the use of aggressive language or tone of voice conveying that compliance with an officer's request is compulsory; the prolonged retention of a person's personal effects, such as identification; a request to accompany the officer somewhere; interaction in a nonpublic place; absence of other members of the public; or the display of emergency lights. No particular factor is determinative or paramount.

7.

In a voluntary encounter between law enforcement and an individual, the person approached need not answer any question put to him or her; indeed, the person may decline to listen to the questions at all and may go on his or her way. And if the person declines, officers may not detain the person, even momentarily without reasonable, objective grounds for doing so; and the person's refusal to listen or answer does not, without more, furnish those grounds.

8.

Under the facts here, reasonable suspicion of criminal activity did not arise when an individual in a legally parked car appeared nervous and startled, reached toward the floor, acted oddly, and sat with his hands clenched and out in front of him when individuals with flashlights, who did not identify themselves as police officers, approached the car and demanded to know what was in his hands.

9.

Generally, consenting to an encounter does not grant officers permission to frisk or search. Another consent, this one agreeing to search, is usually necessary. But some exceptions exist.

10.

A seizure based only on officer safety concerns must be no more than a small intrusion on individual liberty. In other words, the seizure must be strictly limited in duration, scope, and purpose to address the officer's safety concern, which, on its own, does not constitute reasonable suspicion to detain.

Review of the judgment of the Court of Appeals in an unpublished opinion filed April 21, 2017. Appeal from Johnson District Court; BRENDA M. CAMERON, judge. Opinion filed June 7, 2019. Judgment of the Court of Appeals affirming the district court is reversed. Judgment of the district court is reversed and the case is remanded.

*Randall L. Hodgkinson,* of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Shawn E. Minihan*, assistant district attorney, argued the cause, and *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

PER CURIAM:  Two police officers approached Fran Amilcar Andrade-Reyes, who was seated in a car lawfully parked in an apartment complex parking lot. The first officer stood near the driver's door and the second near the front passenger's door. The first officer immediately asked Andrade-Reyes what he had in his hands, which were clenched and held in front of him. When Andrade-Reyes failed to respond, the officer repeated the question several times and eventually commanded Andrade-Reyes to open his hand. Andrade-Reyes did so and dropped a small bag containing cocaine. He was charged with possession of cocaine and possession of drug paraphernalia.

Before trial, Andrade-Reyes filed a motion to suppress evidence, arguing the officers obtained the evidence as the result of an unlawful seizure. The district court denied the motion, finding the encounter was voluntary. Andrade-Reyes appealed, and the Court of Appeals affirmed. *State v. Andrade-Reyes*, No. 115,044, 2017 WL 1425858 (Kan. App. 2017) (unpublished opinion). On review of that decision, we hold that the officers unlawfully detained Andrade-Reyes and conducted an illegal search. Accordingly, we suppress the evidence and remand for further proceedings.

4

FACTUAL AND PROCEDURAL BACKGROUND

Officers Megan Larson and Michael Jason Gross, while on bicycle patrol just after midnight, noticed a car in a dark area of an apartment complex parking lot. The officers observed two people seated in the driver's and front passenger's seats. They parked their bicycles several parking stalls away from the car but did not activate the bicycles' headlamps or emergency lights. Officer Larson approached the vehicle on foot and stood by the driver's door. Officer Gross followed and stood near the front passenger door.

The officers directed the beams of their flashlights into the vehicle as they approached. According to Officer Larson, the passenger, Andrade-Reyes, appeared startled. He reached down toward the floorboard as the officers approached. Officer Larson testified that she could not tell what Andrade-Reyes was doing. When she got closer to the vehicle, she noticed Andrade-Reyes sitting upright with his hands tightly clenched and held out in front of him. She thought this was highly unusual and immediately began asking Andrade-Reyes what was in his hands. Andrade-Reyes did not answer or open his hands when first asked or upon repeated inquiry. Andrade-Reyes eventually moved his right hand past his right knee, dropping something and bringing his hand back up to show Officer Larson it was empty. Officer Larson then asked Andrade-Reyes what was in his left hand. Officer Larson apparently said, "What's in your hand? What's in your hand? Open your hand." (At least that is how the State quoted the body camera audio, which is not in the record on appeal.) Andrade-Reyes eventually opened his left hand, dropping a bag containing a white residue, later determined to be cocaine.

The State charged Andrade-Reyes with possession of cocaine and possession of drug paraphernalia. He filed a motion to suppress evidence, arguing the officers unlawfully seized him. The district court denied his motion, finding the encounter was voluntary. Alternatively, the district court found the officers were justified in detaining

5

Andrade-Reyes "[b]ecause of his evasiveness, they were very nervous about what was going on here and his reaction [to] things made them nervous." The district court found Andrade-Reyes' behavior "odd." The district court also cited Officer Larson's testimony, which the district court summarized as describing Andrade-Reyes as looking "like a deer in the headlights. He was breathing very, very heavy, and she even described how his carotid artery was going." The district court went on to find that Officer Larson's voice on the body camera's audio sounded "nervous." The court further found that Officer Larson did not know if there "was ammunition or a razor blade, a weapon," which caused the officers to be "very concerned." Accordingly, the district court concluded that even if the situation was considered a seizure "it was reasonable for the officers to justify what happened here" because of officer safety concerns. The district court then concluded the seizure "fit in the stop and frisk exception."

The case proceeded to a bench trial on stipulated facts, and Andrade-Reyes preserved his objection to his seizure and the subsequent search. The district court convicted him of possession of cocaine and possession of drug paraphernalia and sentenced him to 10 months' imprisonment, suspended to 12 months' supervised probation.

Andrade-Reyes timely appealed his convictions and sentence. The Court of Appeals affirmed the district court, holding the encounter was consensual, or, alternatively, any seizure was justified by the officers' safety concerns. See *Andrade-Reyes*, 2017 WL 1425858, at *4.

Andrade-Reyes timely filed a petition for review, which this court granted. This court's jurisdiction is proper under K.S.A. 20-3018(b) (petition for review of Court of Appeals decision).

6

Andrade-Reyes argues his encounter with the officers became an investigatory detention—a seizure under the Fourth Amendment to the United States Constitution—when Officer Larson repeatedly asked him what was in his hand and eventually told him to open his hand. The State asserts, however, the encounter was voluntary and not a seizure. Both the district court and the Court of Appeals agreed with the State and held Andrade-Reyes' motion to suppress lacked merit.

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Two aspects of this provision must be considered here: (1) Was Andrade-Reyes seized? (2) If so, was the seizure and resulting search reasonable?

As to the first consideration, courts generally classify contacts between police and individuals into four categories. Some categories describe a seizure and others do not. The four categories are: consensual encounters, also called voluntary encounters; investigative detentions, commonly known as *Terry* stops; public safety stops; and arrests. *State v. Thompson*, 284 Kan. 763, 772, 166 P.3d 1015 (2007); see K.S.A. 22-2402; *Terry v. Ohio*, 392 U.S. 1, 18, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Principles articulated by the United States Supreme Court governing each of these categories direct our consideration of reasonableness—the second consideration demanded by the Fourth Amendment. See, e.g., *Arizona v. Gant*, 556 U.S. 332, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009) (discussing parameters of reasonableness related to arrest and searches incident thereto); *Florida v. Royer*, 460 U.S. 491, 498, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983) (voluntary encounters); *Terry*, 392 U.S. 1 (investigatory detentions); *Camara v.*

*Municipal Court*, 387 U.S. 523, 87 S. Ct. 1727, 18 L. Ed. 2d 930 (1967) (public safety stops).

The district court and the Court of Appeals determined the encounter between the police and Andrade-Reyes fit the first category of a consensual encounter. Generally, courts do not consider a consensual encounter to be a seizure that triggers the protections of the Fourth Amendment. Consent itself makes the encounter reasonable, and the State need not establish that the officers had probable cause before initiating the encounter. In other words if the encounter was voluntary, the State need not establish that the officers approached the car with a reasonable suspicion that Andrade-Reyes had committed, was about to commit, or was committing a crime. See *Florida v. Bostick*, 501 U.S. 429, 434, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991); *Terry*, 392 U.S. at 19 n.16.

The district court alternatively found that, if a seizure occurred, the stop-and-frisk exception applied. Under this exception, which was recognized in *Terry*, 392 U.S. at 21-22, an officer may seize or stop an individual even if lacking probable cause to arrest the individual as long as the officer has a reasonable suspicion of criminal activity. And under some circumstances the officer may frisk the individual. As later summarized by the Court, *Terry* allows a stop and frisk if two conditions are met:

> "First, the investigatory stop must be lawful. That requirement is met in an on-the-street encounter, *Terry* determined, when the police officer reasonably suspects that the person apprehended is committing or has committed a criminal offense. Second, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 326-27, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009).

8

To consider how these concepts fit with the facts of the encounter between police and Andrade-Reyes, we first consider whether the encounter was voluntary. We then consider when reasonable suspicion arose that would justify an investigatory detention. Finally, we consider whether the reasoning of *Terry* extends to allow the detention and questioning for officer safety purposes even if the officers lacked a reasonable suspicion.

*The encounter was not voluntary.*

For an encounter to be voluntary, courts examine whether the officer's conduct would convey to a reasonable person that he or she was free to terminate the encounter. *State v. Reiss*, 299 Kan. 291, 298-99, 326 P.3d 367 (2014); *Thompson*, 284 Kan. at 775. Appellate courts review a district court's factual findings related to this test for substantial competent evidence and conduct a de novo review of the district court's legal conclusions. *Thompson*, 284 Kan. at 776. Here, the facts are not disputed. Instead, the dispute involves the district court's and Court of Appeals panel's legal conclusions. We thus exercise de novo review.

In *Thompson*, we considered whether an interaction between an officer and a driver after a traffic stop's conclusion could be considered voluntary. We listed several nonexclusive factors that tend to establish a voluntary encounter, including "knowledge of the right to refuse, a clear communication that the driver is free to terminate the encounter or refuse to answer questions, return of the driver's license and other documents, and a physical disengagement before further questioning." 284 Kan. at 811. We also set out factors that tend to establish a continued detention—a seizure— including:

9

"the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person, the use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory, the prolonged retention of a person's personal effects such as identification, a request to accompany the officer somewhere, interaction in a nonpublic place, absence of other members of the public, or the display of emergency lights. [Citations omitted.]" 284 Kan. at 811.

No particular factor is determinative or paramount. 284 Kan. 763, Syl. ¶ 20. And these factors can apply to circumstances other than traffic stops that the State argues were a voluntary encounter. See, e.g., *State v. Williams*, 297 Kan. 370, 377, 300 P.3d 1072 (2013).

Here, some factors suggest the officers seized Andrade-Reyes and others do not. As the Court of Appeals noted, the officers did not display a weapon, block the vehicle with the bicycles, activate the bicycles' emergency lights, or act in a threatening manner. *Andrade-Reyes*, 2017 WL 1425858, at *3. These factors were weighty enough in the district court's and the Court of Appeals panel's assessment for both courts to conclude the encounter was voluntary.

On the other hand, the officers approached the vehicle late at night in a dark area of the parking lot. The car was legally parked. There were no bystanders. Officer Larson did not introduce herself or state her reason for approaching the vehicle. Nor did she indicate Andrade-Reyes was free to leave or to refuse to answer questions. Instead, with the beam of her flashlight shining into the car, she immediately began asking Andrade-Reyes what was in his hands. Significantly, she did not take Andrade-Reyes' silence or lack of a physical response as an indication he did not wish to interact with the officers. Instead, according to the district court's findings, her voice became "nervous" and she persisted in asking him what was in his hands until he opened them. Although we do not have the body camera footage available to us, at the suppression hearing, the State

10

seemingly quoted from it, stating that Officer Larson asked: "What's in your hand? What's in your hand? Open your hand." In other words, Officer Larson commanded or ordered Andrade-Reyes to open his hand. Further, although the officers did not activate their emergency lights or park their bicycles behind the vehicle, they stood near the doors of the car—one officer on each side. Andrade-Reyes, as a passenger, had no control over moving the car itself. These factors are much like—and even stronger indications of a seizure than—those in *Williams*, 297 Kan. 370, where we held a detention had occurred.

In *Williams*, two officers approached Deron D. Williams as he walked alone on a sidewalk parallel to a deserted street at 2:30 a.m. The officers pulled their patrol vehicle near Williams and activated their emergency lights. The officers got out of their vehicle and positioned themselves on either side of Williams and immediately began asking questions without indicating he was free to leave. This court found a reasonable person in Williams' circumstances would not have felt free to leave. See *Williams*, 297 Kan. at 379.

One fact distinguishes *Williams* from the circumstances facing Andrade-Reyes, however. In *Williams*, the officers activated their emergency lights, but here they did not. Nevertheless, the *Williams* decision's reliance on the New Mexico Supreme Court's decision in *State v. Soto*, 143 N.M. 631, 179 P.3d 1239 (2008), suggests the presence of lights did not weigh heavily in this court's determination that a reasonable person in Williams' position would not have felt free to ignore the officers.

In *Soto*, the officers did not activate emergency lights during the encounter. Yet the New Mexico Supreme Court held officers exhibited a show of authority when, late at night, they pulled their patrol car alongside Charles Soto, who was riding his bicycle on a deserted street. The officers immediately began questioning Soto about his activities and asked for his identification. The *Soto* court held a reasonable person would not have felt free to leave because of the officers' conduct in immediately asking questions, the

11

isolated location, and the late hour. See 143 N.M. at 632-35. As in *Soto* and *Williams*, the immediate questioning of Andrade-Reyes, the isolated location, and the late hour are important factors.

In addition, Andrade-Reyes' reaction distinguishes his situation from other cases where we have held that a voluntary encounter is not transformed into a seizure simply because an individual responds to questions or provides identification when approached and questioned by an officer. See, e.g., *State v. Lee*, 283 Kan. 771, 775-78, 156 P.3d 1284 (2007) (concluding voluntary encounter did not evolve into investigatory detention "simply because the officer asked [the defendant] for permission to conduct a pat-down search for weapons" and the defendant "chose to voluntarily comply" with officer's request). The Court of Appeals panel cited the decision of a different Court of Appeals panel that reached the same holding as *Lee*. See *Andrade-Reyes*, 2017 WL 1425858, at *3 (citing *State v. Jennings*, 33 Kan. App. 2d 244, 250-51, 99 P.3d 1145 [2004], *rev. denied* 279 Kan. 1009 [2005] [citing and discussing other cases]). The point those cited cases make is that the detainee gave "voluntary answers" and answered questions under circumstances where "the officers' behavior up to and including the time that [the officer] asked [for the detainees'] consent . . . [did] not communicate to a reasonable person that he or she was not free to leave the premises" or refuse to answer questions. *Jennings*, 33 Kan. App. 2d at 250.

Here, however, Andrade-Reyes did not respond. Officer Larson testified that when she asked Andrade-Reyes what was in his hands "[h]e just stayed there with his hands clenched just looking at me and wouldn't move." Rather than accepting that he had the right not to consent to a continuation of the encounter, she repeatedly asked her question and eventually issued a command. Even though Officer Larson spoke in a normal voice and was not loud, rude, or intimidating, her demeanor does not negate her persistence or her command to Andrade-Reyes to open his hands.

12

Andrade-Reyes' lack of response was permissible and cannot be weighed against him if this was a voluntary encounter. In a voluntary encounter, "[t]he person approached . . . need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way." *Royer*, 460 U.S. at 498. And if the person declines, "[h]e may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds." 460 U.S. at 498.

In summary, the totality of the circumstances lead us in our de novo review to a different conclusion from the one reached by the district court and the Court of Appeals panel. The encounter occurred late at night in a dark parking lot with no one else around. Two uniformed police officers approached the vehicle while shining their flashlights on Andrade-Reyes and the driver. The officers did not identify themselves or explain why they were there. Instead, they stood on either side of the vehicle near the doors, and, in a nervous voice, Officer Larson repeatedly asked Andrade-Reyes to open his hands and then ordered him to do so despite his lack of response. Given those circumstances, a reasonable person in Andrade-Reyes' situation would not have felt free to terminate the encounter. Simply put, Andrade-Reyes did not voluntarily engage in an encounter. He thus was seized for purposes of the Fourth Amendment. See *Reiss*, 299 Kan. at 298-99.

*The officers lacked reasonable suspicion to detain Andrade-Reyes.*

Accordingly, to detain Andrade-Reyes for a *Terry* investigative detention, the officers needed to at least have a particularized and objective basis, supported by specific and articulable facts, for suspecting Andrade-Reyes of criminal activity. See *Terry*, 392 U.S. at 21. But the State implicitly conceded in its arguments to the district court that the officers lacked reasonable suspicion of criminal activity when they approached the car.

13

The district court seemed to agree. It concluded the encounter *became* a stop-and-frisk situation. And that conclusion was based on facts that became known late in the encounter—when Andrade-Reyes "drops it, and they see it in plain sight, and they do take it," presumably referring to the white substance that the officers suspected to be cocaine.

The existence of reasonable suspicion at that point near the end of the encounter does not justify what happened before that point—Officer Larson's repeated requests and eventual order for Andrade-Reyes to open his hands. Without a justification for the detention and conduct during this time, Andrade-Reyes' motion to suppress has merit. See *Terry*, 392 U.S. at 13 ("Courts which sit under our Constitution cannot and will not be made party to lawless invasions of the constitutional rights of citizens by permitting unhindered governmental use of the fruits of such invasions.").

To avoid this result, the State must demonstrate that reasonable suspicion arose before that point. But the State does not articulate a valid basis for reasonable suspicion prior to Andrade-Reyes dropping the white substance. Before that, the officers knew only that, after midnight, Andrade-Reyes sat in a car legally parked in a high-crime area, he was extremely nervous, he had reached toward the floor, his hands were clenched, and he did not respond to Officer Larson's questions. These facts did not cause either officer to articulate a subjective belief that a particular crime had occurred, was occurring, or was about to occur or even that they reasonably suspected any criminal activity. Nor did the district court make a clear finding that these facts supported an objective belief of reasonable suspicion or probable cause. See *Terry*, 392 U.S. at 21 (holding that "in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion").

14

Perhaps the district court did not find a reasonable suspicion before the officers saw what was in Andrade-Reyes' hands because these facts are highly ambiguous and subject to innocent explanations. Unlike a car stop where a driver knows police are in pursuit and a furtive movement might be a factor in forming reasonable suspicion (albeit often a weak one), here the circumstances do not indicate that Andrade-Reyes knew Officer Larson and Officer Gross were police officers when he first saw them. The officers did not activate the emergency lights or the headlamps on their police bicycles, and they did nothing to identify themselves as police officers. As Officer Larson testified, it was a very dark area of the parking lot. So dark, in fact, they could not tell what might be going on in the vehicle. Andrade-Reyes reasonably would have had the same difficulties telling what was going on outside the car. Then, when the officers approached, it would have been difficult for Andrade-Reyes to see who was approaching because the officers directed the beams of their flashlights into the car. Given the fact it was a high-crime area, Andrade-Reyes could have been concerned the individuals approaching the car may have been trying to rob him. That belief could innocently explain his odd behavior and nervousness, including an inference that he was hiding something from potential robbers when he reached toward the floorboard. As we have discussed, Andrade-Reyes had the right to refuse to answer questions and his refusal cannot furnish the grounds for reasonable suspicion. As Andrade-Reyes points out, these circumstances are highly analogous to those in *State v. Epperson*, 237 Kan. 707, 703 P.2d 761 (1985).

In *Epperson*, late one night, an officer saw a legally parked car in a high-crime area with two men seated inside. When the occupants saw the officer's patrol car they appeared startled and the passenger appeared to reach down toward the floorboard. The occupants exited the vehicle and began to walk away before the officer stopped his patrol car. The officer told them to stop and began questioning them about why they were in the area. This court held:

15

"The officer had no knowledge of any prior crime; he had not seen or heard of any nearby break-in or other offense and had no reason to suspect these defendants of any such crime. He did not see them commit any offense. Their car was lawfully parked in an area where cars of customers of the private club frequently parked, although there were closer parking spaces available. They did not appear to be armed. The officer was suspicious but he had no objective facts upon which to form a belief that the men were involved in criminal activity. That the men appeared startled when the patrol car emerged from the alley, that the passenger appeared to reach down to the floorboard area, and that the men got out of the car and started to walk away, is not indicative of criminal activity." *Epperson*, 237 Kan. at 713.

Similarly, Officer Larson and Officer Gross did not testify to knowing of any recent criminal activity and the vehicle was legally parked. The fact the encounter occurred late at night in a high-crime area is not indicative of criminal activity, nor is Andrade-Reyes appearing startled and reaching toward the floorboard. See *Epperson*, 237 Kan. at 713. Under the totality of the circumstances, the officers did not have reasonable suspicion to detain Andrade-Reyes. He thus was subject to an unlawful seizure that tainted the subsequent discovery of the white substance. Accordingly, the evidence should have been suppressed unless another basis exists for allowing the questioning and the search. See *Thompson*, 284 Kan. at 772.

*Officer safety concerns alone do not justify an investigatory detention.*

The district court, in discussing an alternative ruling, relied on officer safety concerns in ruling the evidence should not be suppressed. The district court did so in the context of making its ruling that the stop-and-frisk-exception had been satisfied, implicitly concluding the encounter evolved into an investigatory detention. The Court of Appeals panel skipped over whether there was a lawful investigatory detention and

16

focused instead on whether the seizure was justified by officer safety concerns, relying on this court's decision in *Reiss*, 299 Kan. 291. See *Andrade-Reyes*, 2017 WL 1425858, at *4. ("However, even if we were to characterize the encounter as a seizure, it was a reasonable one."). We reject the reasoning of the district court and the panel's alternative justification.

First, as to the district court's ruling, we have noted that the United States Supreme Court has recognized the stop-and-frisk exception applies if two conditions are met: "First, the investigatory stop (temporary detention) must be lawful . . . . Second, to proceed from a stop to a frisk (patdown for weapons), the officer must reasonably suspect that the person stopped is armed and dangerous." *Johnson*, 129 S. Ct. at 781-82. Thus, our conclusion that reasonable suspicion did not justify an investigatory detention means the district court erred in its conclusion of law. Without a valid stop, there cannot be a valid frisk.

This leaves the Court of Appeals' proposition that officer safety can independently justify a detention and search. Generally, consenting to an encounter does not grant officers permission to frisk or search. Another consent, this one agreeing to a search, is usually necessary. The United States Supreme Court Justice Harlan explained this in his concurring opinion in *Terry*:

> "[I]f the frisk is justified in order to protect the officer during an encounter with a citizen, the officer must first have constitutional grounds to insist on an encounter, to make a forcible stop. Any person, including a policeman, is at liberty to avoid a person he considers dangerous. If and when a policeman has a right instead to disarm such a person for his own protection, he must first have a right not to avoid him but to be in his presence. That right must be more than the liberty (again, possessed by every citizen) to address questions to other persons, for ordinarily the person addressed has an equal right

17

to ignore his interrogator and walk away; he certainly need not submit to a frisk for the questioner's protection." *Terry*, 392 U.S. at 32 (Harlan, J., concurring).

Summarizing caselaw related to this point, a leading treatise explains these principles mean an officer cannot initiate a search simply because he or she believes an individual may be armed:

"[I]n the absence of some legitimate basis for the officer being in immediate proximity to the person, a degree of suspicion that the person is armed which would suffice to justify a frisk if there were that basis will not alone justify such a search. For example, if a policeman sees a suspicious bulge which possibly could be a gun in the pocket of a pedestrian who is not engaged in any suspicious conduct, the officer may not approach him and conduct a frisk. And this is so even though the bulge would support a frisk had there been a prior lawful stop. Likewise, if an officer, lacking the quantum of suspicion required by *Terry* to make a forcible stop, instead conducts a non-seizure field interrogation, he may not frisk the person interrogated upon suspicion he is armed; in such a case the officer may protect himself by not engaging in the confrontation." 4 LaFave: A Treatise on the Fourth Amendment, Search & Seizure § 9.6(a) (5th ed. 2018).

See *State v. Dean*, 42 Kan. App. 2d 558, 562, 214 P.3d 1190 (2009) ("[A]n officer must be able to point to specific, articulable facts to support reasonable suspicion for *both* the stop and the frisk.").

Some exceptions are recognized, however. One of those exceptions broadly encompasses the situation that arose in *Reiss*, 299 Kan. 291—the case relied on by the Court of Appeals panel. This exception recognizes that officers conducting a valid investigatory detention might encounter an officer safety issue arising from the activities of someone the officer did not intend to detain, often companions of the detainee. See 4 LaFave, § 9.6(a) and n.6. Such a situation arose in *Reiss* and justified a seizure.

18

In *Reiss*, an officer observed a vehicle without its lights on—the target vehicle—and activated his emergency lights. Rex Reiss was driving a vehicle immediately behind the target vehicle. When he saw the emergency lights, he pulled over and parked directly behind the target vehicle. The officer testified he did not have room to park between Reiss' vehicle and the target vehicle and, for safety reasons, did not want to park in front of the target vehicle. Consequently, he parked behind Reiss. Reiss angrily charged toward the officer, demanding to know why he had been stopped. The officer ordered Reiss to return to his vehicle. Once Reiss had done so, the officer approached Reiss and requested his driver's license and proof of insurance.

We held Reiss was seized when he submitted to the officer's order to return to his vehicle. But the seizure was reasonable in light of legitimate officer safety concerns because of Reiss' aggressive behavior. *Reiss*, 299 Kan. at 301-03. Although the officer did not intend to initiate a traffic stop of Reiss' vehicle, "the circumstances . . . were so similar to a traffic stop that we [found] cases analyzing seizures in that context instructive." *Reiss*, 299 Kan. at 300. In doing so, we drew parallels between Reiss' situation and that of a passenger travelling in a lawfully stopped vehicle. We noted that traffic stops pose dangers to police officers, and the danger to both the officer and the occupants of the vehicle is minimized when the officer exercises command over the situation. For this reason, officers may order the passenger of a lawfully stopped vehicle to either exit the vehicle, remain in the vehicle, or return to the vehicle if they have already exited. See *Reiss*, 299 Kan. at 300-01 (citing *Arizona v. Johnson*, 555 U.S. 323, 330, 129 S. Ct. 781, 172 L. Ed. 2d 694 [2009]; *Maryland v. Wilson*, 519 U.S. 408, 413-14, 117 S. Ct. 882, 137 L. Ed. 2d 41 [1997]).

The *Wilson* Court recognized a traffic violation does not give an officer reasonable suspicion or probable cause to detain the passengers of a vehicle during a traffic stop. But an order to exit the vehicle is a small intrusion on individual liberty because "as a

19

practical matter, the passengers are already stopped by virtue of the stop of the vehicle." *Wilson*, 519 U.S. at 413-14. And the stop itself stems from the officer having reasonable suspicion or probable cause to believe the driver has committed a traffic offense. See *Wilson*, 519 U.S. at 413. So "an officer making a traffic stop may order passengers to get out of the car *pending completion of the stop*." (Emphasis added.) *Wilson*, 519 U.S. at 415. The officer's safety concern justifies the restraint on the passengers' liberty *while* the officer is pursuing a legitimate traffic stop. But nothing in *Wilson* suggests an officer can detain the passengers for an unrelated investigatory purpose. See 519 U.S. at 413-15.

Similarly, in *Reiss*, the officer needed to protect his safety during a traffic stop. Reiss was not the target of the stop and the officer did not have reasonable suspicion to initiate a stop on Reiss' vehicle. But Reiss' presence and aggressive behavior created an officer safety concern that justified the officer exercising control over the scene and ordering Reiss to return to his vehicle. Due to these unique circumstances, we found the officer took "an eminently reasonable measure to preserve officer safety" by ordering an angry motorist to return to his vehicle. Even though the officer's order constituted a seizure, it was not unreasonable under the circumstances. *Reiss*, 299 Kan. at 302.

Unlike a passenger of a *lawfully* stopped vehicle, however, the officer did not have reasonable suspicion to detain Reiss or any occupant of his vehicle. Further, once Reiss had returned to his truck, the officer's safety concern of not wanting to turn his back on Reiss to effectuate the traffic stop on the other vehicle, could be "resolved by advising Reiss he was now free to go." 299 Kan. at 302. Accordingly, we held the officer's additional action of requesting Reiss' driver's license and proof of insurance was an unreasonable investigatory detention because it was not supported by reasonable suspicion. 299 Kan. at 302-03. *Reiss* recognized narrow and limited grounds for the initial seizure; thus, it must be considered in context. When a seizure is "an eminently

20

reasonable measure to preserve officer safety" it does not violate the Fourth Amendment. *Reiss*, 299 Kan. at 302.

Some courts have extended this principle to encounters that begin as consensual but develop into a situation in which a seizure for officer safety reasons is reasonable. Professor LaFave's treatise on search and seizure has summarized these cases, indicating they recognize a "limited exception," which it explains by stating: "If the officer has commenced a nonseizure confrontation without a pre-existing reasonable suspicion supporting a frisk, but such suspicion suddenly appears (most likely because of the suspect's conduct), then the officer is entitled to frisk for his own protection." 4 LaFave, § 9.6(a) and n.14 (citing *United States v. Ellis*, 501 F.3d 958 [8th Cir. 2007] [occupant of house consented to police entry, but another occupant "act[ed] nervously and reach[ed] toward his pocket" providing suspicion justifying search]; *State v. Mann*, 271 Conn. 300, 857 A.2d 329 [2004] [allowing pat-down during consensual encounter after officers developed reasonable suspicion individual was armed and posed an immediate danger]; *People v. Colyar*, 996 N.E.2d 575 [Ill. 2013] [citing LaFave's statement of exception and concluding "(t)hat is precisely what happened here," as "(o)nly after the nonseizure interrogation had commenced did they develop a reasonable suspicion that the vehicle's occupants were armed and dangerous"]; *Commonwealth v. Stephens*, 451 Mass. 370, 374, 383, 885 N.E.2d 785 [2008] [nonseizure encounter with persons within parked cars, when officer saw one "holding a black object in the area of his chest, which he quickly lowered to the area of his lap," officer "was justified in 'opening the door, securing the defendant's hands and ordering the defendant from the car for a pat frisk limited to finding weapons'"]).

We need not determine whether we agree with those decisions or the exception they recognize because, even if we did, the facts here do not meet the requirement that a seizure based only on officer safety concerns must be no more than "a small intrusion on

21

individual liberty." *Reiss*, 299 Kan. at 301. In other words, the seizure must be strictly limited in duration, scope, and purpose to address the officer's safety concern, which, on its own, does not constitute reasonable suspicion to detain. *Reiss*, 299 Kan. at 301-03. The type of seizure contemplated by *Reiss* thus may be more limited than what is permitted in a traditional *Terry* stop. See *Reiss*, 299 Kan. at 301-04; see also *Terry*, 392 U.S. at 20-23 (borrowing the balancing of interests test first articulated in *Camara*, 387 U.S. 523, applying it to encounters such as the one in *Terry* and holding it would be unreasonable to require police to take unnecessary risks simply because they lack probable cause to arrest where reasonable suspicion of criminal activity).

In applying *Reiss* to the current facts, the Court of Appeals did not acknowledge the important distinction between "a small intrusion on individual liberty" for officer safety concerns and an investigatory detention. See *Andrade-Reyes*, 2017 WL 1425858, at *4. Here, the officers' safety concerns are distinguishable from *Reiss*. As Andrade-Reyes points out, he did not make an aggressive or hostile move toward the officers. They approached him; he did not approach them. Officer Gross testified the door was closed and the window was rolled up. Andrade-Reyes made no movements other than moving his right hand in response to Officer Larson's repeated questions. He did not reach out toward the officers and did not reach toward the floorboard. Officer Larson testified that Andrade-Reyes was very nervous and looked like "a deer in the headlights." But he did not show aggressive behavior like Reiss.

Officer Larson testified she was concerned Andrade-Reyes might have had "a razor blade or ammo in his hands." While those things could potentially pose a danger, Officer Larson's actions were not justified under the circumstances because the door was closed and the window was rolled up. It is hard to imagine what danger, if any, loose ammunition could pose absent the presence of a firearm, which Officer Larson did not indicate she suspected to be either in the car or on Andrade-Reyes' person. Without a

22

firearm, Andrade-Reyes could have conceivably stabbed at the officers with loose ammunition or thrown it at them. But doing so would not be possible through a closed door and window. Likewise, Andrade-Reyes would not have been able to harm the officers with a razor blade through a closed door and window. As Officer Gross testified, Andrade-Reyes never reached toward either officer. Neither officer claimed Andrade-Reyes ever reached for the door handle or tried to lower the window. His hands were clenched but they were where the officers could see them. And his refusal to open his hands necessarily precluded him from grabbing a weapon from elsewhere in the vehicle or opening the window or door.

Andrade-Reyes did not answer Officer Larson's question about what was in his hands and did not initially respond to her request to open his hand—he did not show a willingness to participate in a voluntary encounter. So it may have been reasonable to ask Andrade-Reyes to keep his hands where the officers could see them and remain in the vehicle until the officers could leave. See *Reiss*, 299 Kan. at 301-03. Giving such directions would be analogous to the officer ordering Reiss to return to his vehicle. This court held "Reiss' liberty interest to remain outside his truck was small, if present at all. And the intrusion on his liberty was 'minimal.'" The officer's order "merely reinstated the conditions existing before Reiss' rash decision to exit his truck." *Reiss*, 299 Kan. at 302. Similarly, telling Andrade-Reyes to remain in the vehicle and keep his hands where the officers could see them would be minimally intrusive because he was already seated in the vehicle before the officers arrived and did not appear to try to exit when he first noticed the officers or when they made contact. And he was already holding his fists out where the officers could see them.

A limited and momentary restraint on Andrade-Reyes' liberty would not have been unreasonable because of the officers' safety concerns. But those concerns arose because Andrade-Reyes did not wish to answer Officer Larson's questions or show her what was

23

in his hands. In other words, his unwillingness to show or tell Larson what was in his hands is the reason relied on for involuntarily detaining him to continue to ask him what was in his hands. This is unreasonable. See *Royer*, 460 U.S. at 498 (recognizing right to refuse to answer questions and holding person could not be detained for refusing).

Officer Larson's repeated questioning about what Andrade-Reyes had in his hands constituted an investigatory detention; it went beyond "merely reinstat[ing] the conditions existing before [the encounter]." *Reiss*, 299 Kan. at 302. But Officer Larson did not have reasonable suspicion of criminal activity to detain Andrade-Reyes; thus, the detention was unlawful. Accordingly, all evidence obtained as a result must be suppressed because it was tainted by an unlawful seizure. See *Reiss*, 299 Kan. at 304.

Judgment of the Court of Appeals affirming the district court is reversed. Judgment of the district court is reversed and the case is remanded.

＊＊＊

LUCKERT, J., dissenting:  I dissent from the majority's conclusion that the evidence seized by Officers Megan Larson and Jason Gross must be suppressed. While I agree with the majority's synthesis of the applicable law, I do not agree with its application of the law to the facts. I would hold that once officers initiated the encounter, a reasonably prudent officer would have been warranted in believing, because of specific and articulable facts, that Fran Amilcar Andrade-Reyes was armed and posed an immediate danger. Because of that belief, it was reasonable for officers to demand that Andrade-Reyes open his hand.

As the majority points out, several courts have recognized that an officer may conduct a search limited to the need for officer safety if, after initiating the encounter, the

24

officer develops an objectively reasonable belief that the person is armed and poses an immediate danger, even if the officer lacked probable cause or a reasonable suspicion. See, e.g., *United States v. Ellis*, 501 F.3d 958 (8th Cir. 2007); *State v. Mann*, 271 Conn. 300, 857 A.2d 329 (2004); *People v. Colyar*, 996 N.E.2d 575 (Ill. 2013); *Commonwealth v. Stephens*, 451 Mass. 370, 885 N.E.2d 785 (2008); see also 4 LaFave, Search & Seizure § 9.6(a). This general principle finds support by extension of United States Supreme Court caselaw to these facts.

The assessment of reasonableness begins with considering the "governmental interest which allegedly justifies official intruding upon the constitutionally protected interest of the private citizen." *Camara v. Municipal Court*, 387 U.S. 523, 534-35, 87 S. Ct. 1727, 18 L. Ed. 2d 930 (1967). The United States Supreme Court identified the interest at issue here in its decision in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 1881, 20 L. Ed. 2d 889 (1968), when it stated:

> "[W]e cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." 392 U.S. at 24.

Ultimately, the *Terry* Court permitted "a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." 392 U.S. at 27. *Terry* limited this rule to investigative detentions, but it does not offend the Fourth Amendment's notion of reasonableness to extend this rule to situations in which objective concerns for officer safety arise in the midst of a consensual

encounter. After all, the officer engaged in a consensual encounter is in a situation allowed by the Fourth Amendment.

The majority declined to discuss or consider the possibility this exception could apply here because it held Officer Larson's action exceeded the scope of what was necessary to satisfy officer safety concerns. Slip op. at 21 (citing *State v. Reiss*, 299 Kan. 291, 301, 326 P.3d 367 [2014]). Certainly, because the exception must be "narrowly drawn," *Terry*, 392 U.S. at 27, courts should carefully examine whether an officer's actions are reasonable. But *Terry* stated that an officer should be "entitled to draw from the facts in light of his experience." 392 U.S. at 27. And the Court recognized officers must take "necessarily swift action predicated upon the on-the-spot observations of the officer on the beat." 392 U.S. at 20.

The majority, however, gives little credence to the officers' on-the-spot evaluation and engages in an exercise of Monday morning quarterbacking. Removed from the stress of the encounter, the majority concludes the officers could have simply told Andrade-Reyes to keep his hands in sight while they left. But it was late at night and dark, and the officers testified they had difficulty seeing into the car. Their bicycles were parked some distance away and offered no protection. And the officers testified this was a high crime area. Given those circumstances, it seems unreasonable to me to expect officers to walk away from someone they suspected might have ammunition and who had earlier reached toward the floorboard of the car where a gun could easily have been hidden. The officers' actions in demanding Andrade-Reyes show what was in his hands was a minimal intrusion given the weighty interest in officer safety. See *Reiss*, 299 Kan. at 301.

Certainly, an officer's good faith is not enough, and courts must exercise detached, neutral scrutiny by applying an objective standard to the facts. *Terry*, 392 U.S. at 21-22. Here, the district judge did just that. The judge had the opportunity to hear the testimony

of the officers and to view the body camera footage. We did not. Based on the testimony and evidence, the judge found the officers "were very concerned." The record suggests the facts available to the officers would warrant a reasonably cautious person to believe that ordering Andrade-Reyes to reveal what he had in his hand was an appropriate action for officer safety purposes. And that action was a limited intrusion reasonable under the circumstances.

I would affirm the district court and the Court of Appeals.