NOT DESIGNATED FOR PUBLICATION

No. 124,150

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

SAMANTHA RUSH,
*Appellant*.

MEMORANDUM OPINION

Appeal from Geary District Court; RYAN W. ROSAUER, judge. Opinion filed November 10, 2022. Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Tony Cruz*, assistant county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., GREEN and MALONE, JJ.

PER CURIAM: Samantha Rush appeals her conviction following a jury trial of one count of possession of amphetamine. Rush claims the district court erred in failing to suppress evidence seized during the search of her vehicle and in failing to suppress her statements to law enforcement. She also claims the district court erred when it used a jury instruction stating the jury "should find the defendant guilty" rather than "may find the defendant guilty." Finding no error, we affirm the district court's judgment.

1

FACTUAL AND PROCEDURAL BACKGROUND

On November 22, 2019, at about 2:45 a.m., Geary County Sherriff's Deputy Corrie Shoemake saw a vehicle traveling at about 30 or 35 miles per hour westbound on I-70. The minimum speed limit on this portion of I-70 is 40 miles per hour. Shoemake believed the slow speed at the late hour could be an indicator of impairment, so he turned on the camera in his car to record the vehicle's movement. Shoemake followed the vehicle as it exited the interstate onto East Flint Hills Boulevard. After about a half mile, the car pulled to the roadside and turned on its hazard lights. Shoemake pulled behind the car and turned on his emergency lights.

Shoemake approached the driver's side of the vehicle and spoke to Rush, who was driving the car. The passenger was later identified as Alicia Campbell. Shoemake asked what was going on, and Rush responded that she was having a problem with her car. Shoemake explained that he was following her because she was driving below the minimum speed limit on the interstate. Rush said she tried, but could not, drive faster. Rush explained that she hit a bump the day before which damaged her wheel well. She stated that she pulled over because her car started to sound worse in the damaged area.

Shoemake told Rush he would try to look at the problem and walked around the back of the car to the front passenger side. Shoemake observed that the front wheel well was touching the tire. Shoemake asked Campbell to roll the window down so he could speak to Rush. Shoemake spoke to Rush across the passenger and notified her that the front wheel well was pressed against her tire. Rush exited the car, with Shoemake's permission, and walked to the passenger side to look at the damage. Rush asked Shoemake if he knew how to fix the wheel well and he responded that he did not have the right tool. As they were speaking about the damage to the vehicle, Officer Shoemake "detected the odor of marijuana coming from the vehicle."

2

Shoemake asked Rush for her driver's license, and she responded that she lost it but that she did have a license to drive. Shoemake then briefly inspected the interior of Rush's vehicle with his flashlight. The questioning proceeded as follows:

"[OFFICER SHOEMAKE:]  Do you have anything illegal in the car at all?

"[RUSH:]  No.

"[OFFICER SHOEMAKE:]  No? Did someone smoke marijuana in there a little while ago?

"[RUSH:]  No.

"[OFFICER SHOEMAKE:]  No? Any reason I'm smelling anything?

"[RUSH:]  I mean not unless it's my cigarette.

"[OFFICER SHOEMAKE:]  No. Did you smoke in there a little while—just be honest with me. Did someone smoke in there a little while ago?

"[CAMPBELL]:  I was earlier.

"[OFFICER SHOEMAKE:]  You were earlier? Ok. Alright ma'am. Do me a favor, just sit tight. I appreciate your honesty ok. (to Rush) Did you smoke a little while ago? Ma'am your eyes are glossy, really glossy. That's why I'm asking.

"[RUSH:]  I mean I'm tired.

"[OFFICER SHOEMAKE:]  You're tired? Ok. I got you. Listen, I just want the honest truth, ok? I understand. I'm not going to issue a citation. The reason I went behind you was because it's not typical and it's not safe for someone to be driving that slow on the interstate. Ok?

"[RUSH:]  Yes, sir.

"[OFFICER SHOEMAKE (to Campbell):]  Is there anything in the car at all, miss?

"[CAMPBELL:]  I have something on me."

Campbell then opened her wallet, pulled out white tissue paper containing marijuana, and handed it to Shoemake. He then told the women to "sit tight," thanked Campbell for her honesty, and requested her driver's license. Campbell asked if she was going to go to jail, and Shoemake stated that "honesty goes a long way."

Shoemake returned to his patrol car to call another officer to the scene. When the second officer arrived, Shoemake explained that he planned to search the vehicle because Campbell handed him about one gram of marijuana. He stated he was not going to charge Campbell due to her honesty and the small amount of marijuana.

Shoemake then returned to Rush's vehicle and explained that he could smell marijuana, her friend gave him marijuana, and those facts gave him probable cause to search her vehicle. He asked Rush if he was going to find anything else in the vehicle and stated that honesty goes a long way. Rush admitted that her friend had more marijuana in the driver's door in a clear bag. Shoemake asked if Rush wanted to sit in his patrol car because of the cold or stay outside. He explained that she was detained but not under arrest. Rush stated that she would rather sit in the patrol car.

Officer Shoemake then searched Rush's car and found the marijuana in the driver's side door, as Rush had mentioned. In the console between the front seats, Shoemake found a clear plastic bag containing pills. The bag was labeled "Adderall." Shoemake continued to search the backseat and moved on to the front passenger seat where Campbell had been sitting. He opened a cupholder ashtray and found raw tobacco and a couple expended marijuana blunts. Shoemake then found a "pretty big sized blunt" in the passenger side door and "some marijuana."

After completing his search, Shoemake went back to his patrol car to speak to Rush. Shoemake notified Rush that he would ask her some questions but would read her *Miranda* rights first. See *Miranda v. Arizona*, 348 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Shoemake then read Rush's *Miranda* rights aloud and she orally confirmed she understood them. The following exchange took place:

> "[OFFICER SHOEMAKE:]  Do you wish to speak to me?
> "[RUSH:]  What happens if I don't speak to you? I go to jail?

"[OFFICER SHOEMAKE:]  What's that? No. I can't tell you if you don't talk to me you're going to go to jail, ma'am. That's not how this works. I can't coerce you and say 'hey if you don't talk to me I'm going to take you to jail.' Before I can ask you any questions about what I found in that car, I have to read you your rights. So you're already in detention, ok. You're being detained. You're not under arrest at this moment in time. But before I can ask you any questions, I gotta read you your rights and I gotta make sure that you understand them and I need a verbal yes or no whether you'd like to speak with me or not.

"[RUSH:]  So what happens if I don't speak to you?

"[OFFICER SHOEMAKE:]  I can't answer that, ma'am. I just want to ask you some questions. If you don't want to that's your right. Ok? Does that make sense?

"[RUSH:]  Yes, sir. I'll answer your questions."

Shoemake asked about the marijuana found in the driver's side door and the blunt. Rush stated all the marijuana belonged to Campbell. Shoemake asked if there was anything else she wanted to tell him about what he found in the car. Rush stated that Shoemake probably found some pills that she was holding for a friend. Rush then admitted that she had taken "maybe two" of the pills without a prescription.

After speaking with Rush, Shoemake went to the other patrol vehicle where Campbell was sitting and read her *Miranda* rights to her. Campbell stated she would speak to Shoemake and admitted that the marijuana found in the driver's side door was hers. Campbell did not seem to be aware of the large blunt that Shoemake had found in the passenger side door. Campbell denied having any pills in Rush's car.

On December 4, 2019, the State charged Rush with one count of possession of amphetamine. Several months later, Rush moved to suppress the evidence. She argued that Shoemake's reasonable suspicion of illegal activity dissipated after he confirmed the reason for her slow speed, and any further investigation was unlawful requiring suppression of the evidence. In response, the State argued that Rush's initial encounter with Shoemake was either voluntary or a valid traffic stop based on her slow speed on the

5

interstate. The State argued that Shoemake obtained new and independent reasonable suspicion to detain Rush when he smelled the marijuana coming from the car, and he had probable cause to search the vehicle when Campbell handed him marijuana.

At the hearing on the motion to suppress, Shoemake testified that while he was discussing the damaged wheel well with Rush and Campbell, he smelled the odor of burnt marijuana—giving him reason to inquire further about illicit substances. Rush testified that she did not feel free to leave—and was detained—when Shoemake said he would walk around her vehicle to see the damage to her front passenger wheel well. Rush testified that she did not feel free to leave because "normally, when you see police lights behind your vehicle, that means you're in some kind of trouble."

The district court denied Rush's motion to suppress, finding that Rush voluntarily pulled to the roadside, and in any event, Shoemake had grounds to stop Rush's vehicle because of the minimum speed violation. The district court found that Shoemake smelled marijuana while he was discussing the wheel damage with Rush, giving Shoemake independent reasonable suspicion to detain Rush. The district court found there was no unlawful seizure and thus no unlawful search.

Right before trial, the district court held a *Jackson v. Denno* hearing to address the voluntariness of Rush's statements to Shoemake. See *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964). After hearing testimony from Shoemake and Rush, the district court found that Rush's statements were voluntarily made and could be admitted at trial. More specifically, the district court found that (1) Rush made statements about the pills after she had received the *Miranda* warnings, (2) it was typical for a suspect to sit in the back of a patrol car during this type of questioning, (3) Shoemake never threatened Rush or told her she would go to jail if she refused to speak to him, and (4) Shoemake reiterated her right to remain silent.

6

The district court held a jury trial on March 8-9, 2021. Rush made a standing objection to the introduction of the evidence and her statements at the trial. The State called Shoemake and a Kansas Bureau of Investigation chemist who testified that the pills found in Rush's vehicle tested positive for amphetamine. Rush did not testify or present any witnesses. She argued to the jury that the pills belonged to her friend. Rush objected to the district court's reasonable doubt instruction, arguing that the phrase that the jury "should find the defendant guilty" should be changed to "may find the defendant guilty." The jury found Rush guilty as charged.

On May 26, 2021, the district court sentenced Rush to 11 months' imprisonment but granted probation. Rush timely appealed the district court's judgment. On appeal, Rush argues that the district court erred in (1) denying her motion to suppress evidence obtained in the search of her vehicle, (2) admitting statements she made to Shoemake after she received her *Miranda* rights, and (3) denying her requested jury instruction.

### DID THE DISTRICT COURT ERR IN DENYING RUSH'S MOTION TO SUPPRESS EVIDENCE OBTAINED DURING THE SEARCH OF HER VEHICLE?

Rush first claims the district court erred in denying her motion to suppress evidence recovered from the search of her vehicle because it was obtained as the result of an unlawful search and seizure. She argues that her encounter with Shoemake transitioned from "a possibly justifiable encounter to an illegal investigation that led to an unlawful search." Rush argues that after verifying the damage to her tire, Shoemake extended the encounter without legal justification by requesting her driver's license and using his flashlight to look inside her vehicle.

The State responds that the initial encounter between Rush and Shoemake was voluntary. The State contends that during the voluntary encounter, Shoemake legally acquired reasonable suspicion to seize Rush and probable cause to search her vehicle.

7

Alternatively, the State argues that Shoemake had reasonable suspicion to detain Rush in a valid traffic stop, and during that stop he properly acquired probable cause to search her vehicle for illegal substances.

The district court relied mainly on Shoemake's body camera footage to determine whether Rush's detention and the search of her vehicle was lawful. Because the body camera footage is an accurate depiction of the events, and the parties do not dispute its contents, this case does not present a significant factual dispute about the interaction between Rush and Shoemake. When the material facts supporting a district court's decision on a motion to suppress evidence are not in dispute, the ultimate question of whether to suppress is a question of law over which an appellate court has unlimited review. *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018).

Each person has a right to be secure in their person and property against unreasonable searches and seizures under the Fourth Amendment to the United States Constitution and section 15 of the Kansas Constitution Bill of Rights. Whether a seizure has occurred depends on the type of interaction between the citizen and law enforcement. There are generally four types of encounters between citizens and police: (1) voluntary or consensual encounters, (2) investigatory detentions, (3) public safety stops, and (4) arrests. *State v. Guein*, 309 Kan. 1245, 1253, 444 P.3d 340 (2019). A consensual encounter with law enforcement is not a seizure; the other three types of interactions are seizures. *State v. Reiss*, 299 Kan. 291, 297, 326 P.3d 367 (2014).

When an analysis of a motion to suppress requires examination of the search and the seizure, determining the legality of the seizure is the first step because the illegality of the detention can taint a subsequent consent and search. *State v. Thompson*, 284 Kan. 763, 772, 166 P.3d 1015 (2007). This court must analyze the distinct interactions to determine whether and when Rush was seized so that her Fourth Amendment rights were triggered. Here, the distinct interactions are (1) the initial interaction between Rush and

Shoemake when he approached her vehicle; and (2) the interaction between the parties after Shoemake inspected the damaged vehicle and smelled the marijuana.

*The initial interaction between Shoemake and Rush was a voluntary encounter.*

We must first determine whether the initial interaction between Rush and Shoemake was voluntary or an investigatory detention. The district court found that the initial interaction between Shoemake and Rush was voluntary. Rush now argues that even though she at first stopped of her own volition, "at the point that the officer exerted authority over her, the interaction ceased being a voluntary encounter." She argues Shoemake exerted authority over her when he activated his emergency lights and notified her that he intended to pull her over. The State argues that the initial encounter was consensual because a reasonable person in Rush's position would not believe they were being detained. Alternatively, the State argues that Shoemake had reasonable suspicion to conduct a traffic stop due to Rush's slow speed, and he obtained probable cause to search the vehicle during that stop.

Voluntary encounters are not considered seizures and do not trigger protections of the Fourth Amendment. On the other hand, a seizure occurs where there is an application of physical force or a show of authority which, in view of all the circumstances, would communicate to a reasonable person that they are not free to leave and the person does in fact submit to that show of authority. *State v. Morris*, 276 Kan. 11, 19, 72 P.3d 570 (2003). "[I]nvestigatory detentions are constitutionally permissible if an objective officer would have a reasonable and articulable suspicion that the detainee committed, is about to commit, or is committing a crime." *Hanke*, 307 Kan. at 828. Investigatory detentions "'must be temporary and last no longer than is necessary to effectuate the purpose of the stop.'" *State v. Doelz*, 309 Kan. 133, 139, 432 P.3d 669 (2019).

In determining the voluntariness of the encounter, Kansas courts review whether, under the totality of the circumstances, a reasonable person would have felt free to disregard the officer's questions, decline the officer's request, or otherwise terminate the encounter. *State v. Cleverly*, 305 Kan. 598, 606, 385 P.3d 512 (2016). A voluntary encounter is not transformed into a seizure simply because an individual responds to questions or provides identification when approached and questioned by an officer. *State v. Williams*, 297 Kan. 370, 376, 300 P.3d 1072 (2013). The court may consider several factors in evaluating whether an encounter is voluntary; no single factor is dispositive. *Reiss*, 299 Kan. at 298-99. And the presence of reasonable suspicion to conduct a traffic stop does not inherently dispose of the possibility that the interaction was voluntary. See *State v. Baacke*, 261 Kan. 422, 438, 932 P.2d 396 (1997) (finding a voluntary interaction where an officer approached a vehicle's occupants who were illegally parked).

If the interaction here was voluntary, then the State need not prove that Shoemake possessed a reasonable suspicion that Rush had committed, was about to commit, or was committing a crime. See *State v. Andrade-Reyes*, 309 Kan. 1048, 1053, 442 P.3d 111 (2019). While not dispositive, the Kansas Supreme Court has set out "factors that tend to establish a voluntary encounter, including 'knowledge of the right to refuse, a clear communication that the driver is free to terminate the encounter or refuse to answer questions, return of the driver's license and other documents, and a physical disengagement before further questioning.'" 309 Kan. at 1054.

Shoemake parked behind Rush and activated his emergency lights. When Shoemake approached and spoke to Rush, he asked, "What's going on tonight?" Rush responded that she was having car trouble. Shoemake explained that he had been following her because she was driving below the minimum speed limit, but he never told her that he intended to pull her over for that reason. When Rush explained the issue with her wheel well, Shoemake stated, "Alright let me look at this side over here," and walked around Rush's vehicle to inspect it. Shoemake did not ask for Rush's identification or

10

make any demands of her until several minutes into their interaction. After looking at the damage to her car, Shoemake spoke to Rush through the passenger side window. She asked him if she could get out to look at the damage, and he responded affirmatively.

Shoemake's activation of his emergency lights and Rush's request to exit her vehicle are the only factors that could weigh in favor of finding the initial interaction was a seizure. But an officer's activation of their emergency lights is not definitive evidence of a seizure. Rather, use of emergency lights may signify different meanings under different circumstances. *Thompson*, 284 Kan. at 808. Here, the interaction occurred at about 3 a.m. on an exit road just off the interstate highway. It would be reasonable for an officer to activate his emergency lights along this type of road late at night to ensure other drivers of the officer's presence on the roadside. See 284 Kan. at 809. As for Rush's request to exit her vehicle, that is evidence of her subjective state of mind and not objective evidence to support a seizure. See 284 Kan. at 809 (explaining a citizen's subjective state of mind is irrelevant in determining the nature of an encounter).

We find that the initial interaction between Shoemake and Rush was a voluntary encounter. Rush pulled over without Shoemake activating his emergency lights, he did not immediately request Rush's driver's license or insurance information, and he did not disclose any intent to pull her over. Rather, their interaction focused on the damage to Rush's car until Shoemake smelled the odor of burnt marijuana.

But even if the initial contact had been a seizure, we agree with the State that Shoemake had reasonable suspicion sufficient to stop Rush to conduct an investigatory detention. Shoemake observed Rush committing a traffic infraction by driving below the mandatory minimum speed on the interstate. This conduct violates K.S.A. 8-1561(b). A traffic violation is a valid reason to carry out a traffic stop. *State v. Marx*, 289 Kan. 657, 662, 215 P.3d 601 (2009). Thus, Shoemake had reasonable suspicion to approach and detain the vehicle's occupants to investigate the traffic infraction.

11

*Shoemake gained independent reasonable suspicion to detain Rush when he smelled the marijuana while discussing the damaged wheel well with Rush and Campbell.*

Rush argues that even if the initial encounter were consensual, Shoemake did not have reasonable suspicion to request her driver's license or inspect the vehicle's interior with his flashlight. The State responds that Shoemake smelled the odor of burnt marijuana before he requested Rush's driver's license. As a result, the State argues that Shoemake could extend the encounter to ask about suspected illegal activity.

As stated above, our Supreme Court has held that "investigatory detentions are constitutionally permissible if an objective officer would have a reasonable and articulable suspicion that the detainee committed, is about to commit, or is committing a crime." *Hanke*, 307 Kan. at 828. The reasonable suspicion must be present before the officer requests a motorist's license and documentation. See *Reiss*, 299 Kan. at 303.

Throughout his testimony at the suppression hearing, Shoemake stated that he smelled the odor of burnt marijuana while discussing the damaged vehicle with Rush and Campbell. Shoemake then asked Rush for her driver's license, and she responded that she had lost it. Shoemake's request for Rush's driver's license was valid because he had detected the odor of burnt marijuana, providing him with reasonable suspicion to conduct an investigatory detention of Rush. Although Shoemake said nothing to Rush about smelling the marijuana until after he asked for her driver's license, his testimony makes it clear that he smelled marijuana while discussing the damaged wheel well with Rush, which led to his additional questioning. When Shoemake asked if there was anything illegal in the car, Campbell responded affirmatively, pulled out a white tissue paper containing marijuana, and handed it to Shoemake. At that point, Shoemake had probable cause to search the vehicle, and Rush does not argue otherwise. The vehicle search led to the discovery of the amphetamine pills. Based on the record, Shoemake legally seized the evidence, and the district court did not err in denying Rush's motion to suppress.

12

## DID THE DISTRICT COURT ERR IN ALLOWING RUSH'S STATEMENTS TO SHOEMAKE TO BE ADMITTED INTO EVIDENCE?

Rush next challenges the district court's admission of her statements at trial. She argues that Shoemake used an unconstitutional two-step interrogation technique to obtain her inculpatory statements. More specifically, Rush argues that during the first step of the technique, Shoemake brought her to the front of his patrol vehicle, subjected her to a custodial interrogation, and obtained admissions that Campbell had more marijuana in the vehicle without first reading Rush her rights under *Miranda*. Rush argues that the second step occurred after the search while she was in the backseat of Shoemake's patrol car and Shoemaker advised her of her rights under *Miranda*, and then questioned her about the contraband he found in her car. Rush argues that the illegal first step tainted the statements she made in the second step and rendered the statements involuntary.

The State argues that the district court correctly found the interrogation in front of Shoemake's patrol vehicle was noncustodial and thus did not trigger Rush's rights under *Miranda*. The State also argues that Rush voluntarily, knowingly, and intelligently waived her *Miranda* rights in her second interview with Shoemake, as she never testified that she was confused about her rights during the *Jackson v. Denno* or other hearings. Thus, the State argues that Rush's statements to Shoemake were admissible.

The Fifth Amendment to the United States Constitution guarantees individuals the right against self-incrimination. *State v. Salary*, 301 Kan. 586, 604, 343 P.3d 1165 (2015). In order to protect this right and to safeguard against impermissibly coercive interrogations, government agents are required to inform a person in custody of the right to remain silent and the right to the appointment of counsel before conducting an interrogation. *Miranda*, 384 U.S. at 444-45. But law enforcement officers need not administer *Miranda* warnings to everyone whom they question. *State v. Jones*, 283 Kan.

13

186, 192, 151 P.3d 22 (2007). Thus, the first inquiry the court must address is whether the individual was in custody when questioned.

Second, assuming the person was in custody, the court must determine whether the individual voluntarily waived their rights under *Miranda*. The voluntariness of a waiver of a defendant's *Miranda* rights is a question of law that appellate courts decide de novo based on the totality of the circumstances. *State v. Parker*, 311 Kan. 255, 257-58, 459 P.3d 793 (2020). The appellate court does not reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence in determining whether a *Miranda* waiver was voluntary. *State v. Vonachen*, 312 Kan. 451, 463-64, 476 P.3d 774 (2020).

Rush argues that Shoemake subjected her to a two-step interrogation that confused her, leading her to waive her *Miranda* rights involuntarily, unknowingly, and unintelligently. A two-step interrogation occurs when an officer elicits inculpatory admonitions from a citizen, then advises them of their *Miranda* rights and subjects the citizen to more questioning. In that circumstance, this court must determine whether the two-step questioning coerced the citizen into confessing. See *Missouri v. Seibert*, 542 U.S. 600, 614-17, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004) (police may not use pre-*Miranda* incriminating statements to elicit post-*Miranda* statements). As we said before, the district court relied mainly on Shoemake's body camera footage to decide whether Rush voluntarily waived her *Miranda* rights, so the material facts are not disputed.

*Rush was not in custody when Shoemake questioned her before the vehicle search.*

Rush argues that the first step of the unconstitutional two-step questioning occurred in front of Shoemake's patrol vehicle right before he searched Rush's vehicle. The court must first determine whether this questioning was an investigatory interrogation or a custodial interrogation triggering *Miranda*.

"'A custodial interrogation is defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his or her freedom in any significant way.' A custodial interrogation is distinguished from an investigatory interrogation, which occurs as a routine part of the fact-finding process before the investigation reaches the accusatory stage. [Citation omitted.]" *State v. Regelman*, 309 Kan. 52, 59, 430 P.3d 946 (2018).

The *Miranda* Court "made it clear that its decision was intended to apply to in-custody interrogations, and the decision generally was not intended to apply to on-the-scene police questioning of a suspect in the fact-finding process." *State v. Hutchens*, No. 119,661, 2020 WL 1329181, at *7 (Kan. App. 2020) (unpublished opinion). Factors the court considers when deciding whether an interrogation is investigative or custodial include: (1) the place and time of the interrogation; (2) the duration of the interrogation; (3) the number of law enforcement officers present; (4) the conduct of the officer or officers and the person being questioned; (5) the presence or absence of actual physical restraint or its functional equivalent, such as drawn firearms or a stationed guard; (6) whether the person is being questioned as a suspect or a witness; (7) whether police escorted the person being questioned to the interrogation location or the person arrived under the person's own power; and (8) the result of the interrogation, for instance, whether the person was allowed to leave, was detained further, or was arrested after the interrogation. No one factor outweighs another, and the factors do not bear equal weight. A court must analyze every situation on its own facts. *Regelman*, 309 Kan. at 59.

Rush was being questioned as part of an investigatory detention—and was not in custody—when speaking to Shoemake in front of the patrol vehicle. She was detained, but not under arrest, during the search of her vehicle because Shoemake had reasonable suspicion that she may be committing a crime. "In the case of a traffic stop, a person is only under arrest if he or she is physically restrained or deprived of his or her freedom in a significant way for the purpose of answering for a crime." *State v. Goff*, 44 Kan. App. 2d 536, 542, 239 P.3d 467 (2010) (after finding marijuana in the vehicle, the officer

15

continued the investigatory detention when he questioned the driver about marijuana in a locker). Although Shoemake asked Rush to come with him to speak in front of his patrol car, it was necessary and reasonable for Rush to exit her vehicle during the search. This was not a significant deprivation of freedom consistent with a custodial interrogation but was instead "a routine part of the fact-finding process before the investigation reaches the accusatory stage." *Regelman*, 309 Kan. at 59.

Shoemake had no information in his initial questioning of Rush to believe that she possessed any illegal substances. Although he told Rush several times that her eyes were bloodshot as though she had smoked marijuana, she did not admit to this or provide any information that she had marijuana. Rather, she admitted only that her passenger had marijuana in the vehicle. Rush made no statements about the amphetamine pills she was ultimately charged with illegally possessing.

Rush was not subjected to an illegal custodial interrogation while in front of the patrol vehicle. Instead, she faced an investigatory interrogation which did not trigger *Miranda* warnings. Thus, there was nothing illegal about Shoemake's initial questioning of Rush that could have tainted the voluntariness of Rush's *Miranda* waiver when Shoemake later questioned her in the backseat of the patrol vehicle. Rush did not make any incriminating statements about possessing or having control over the amphetamine pills until after Shoemake read Rush her *Miranda* rights and she responded that she understood them. As a result, the district court did not err in finding that Rush's statements to Shoemake were admissible at trial.

### DID THE DISTRICT COURT ERR IN INSTRUCTING THE JURY?

Finally, Rush claims the district court erred in denying her request to change the term "should" to "may" in the reasonable doubt instruction approved in PIK Crim. 4th 51.010 (2020 Supp.). Rush argues that the last sentence in the instruction should read:  "If

you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you *may* find the defendant guilty." (Emphasis added.) Rush argues that "should" is an imperative term which directs the jury verdict, rather than leaving room for the jury to exercise its power of decision.

When analyzing jury instruction issues, appellate courts follow a three-step process: (1) determining whether the appellate court can or should review the issue, in other words, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred; and (3) assessing whether the error requires reversal. *State v. Holley*, 313 Kan. 249, 253, 485 P.3d 614 (2021). At the second step, appellate courts consider whether the instruction was legally and factually appropriate, using an unlimited standard of review of the entire record. 313 Kan. at 254.

Rush objected to the jury instruction given by the district court, so she preserved the issue. But as Rush acknowledges, the jury instruction at issue has been upheld by the Kansas Supreme Court. *State v. Kornelson*, 311 Kan. 711, 721-22, 466 P.3d 892 (2020); *State v. Galloway*, 311 Kan. 238, 252, 459 P.3d 195 (2020). Thus, the jury instruction is legally appropriate. The Court of Appeals is duty-bound to follow Kansas Supreme Court precedent unless there is some indication that our Supreme Court is departing from its previous position. *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). We have no indication our Supreme Court is departing from its recent decisions in *Kornelson* and *Galloway*. Thus, Rush's claimed jury instruction issue fails.

Affirmed.